732 A.2d 1136 (1999)
323 N.J. Super. 322
STATE of New Jersey, Plaintiff-Appellant,
v.
Gregory S. BRUNO, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 25, 1999.
Decided June 29, 1999.
*1137 Peter E. Warshaw, Jr., Assistance Prosecutor, argued the cause for plaintiff-appellant (John Kaye, Monmouth County Prosecutor, attorney; Mary R. Juliano, Assistant Prosecutor, of counsel and on the brief).
Edward C. Bertucio, Jr., argued the cause for defendant-respondent (Giordano, Halleran & Ciesla, attorneys; Norman M. Hobbie, of counsel; Mr. Bertucio, on the brief).
Before Judges MUIR, Jr., KEEFE, and EICHEN.
The opinion of the court was delivered by KEEFE, J.A.D.
This appeal stems from the State's motion to disqualify the firm of Giordano, Halleran & Ciesla (the firm) from representing the defendant, Gregory Bruno, in the underlying criminal matter on the ground that the firm had also represented the lead detective in the criminal investigation, Ronald D. Ohnmacht, in a prior civil rights complaint and a workers' compensation matter. The State argued that the firm continued to represent Ohnmacht after the final judgment in the workers' compensation matter and as such, the representation of defendant constituted a conflict of interest and an appearance of impropriety. Following oral argument, Judge Kennedy denied the State's motion for disqualification. We granted the State's motion for leave to file an interlocutory appeal. The State now raises the following issues for review:
I. THE FIRM SHOULD BE DISQUALIFIED BECAUSE IT ACCEPTED *1138 DEFENDANT BRUNO'S CASE IN VIOLATION OF RPC 1.7(a)
II. THE FIRM SHOULD BE DISQUALIFIED BECAUSE REPRESENTATION OF BRUNO CREATES AN APPEARANCE OF IMPROPRIETY
For the reasons stated herein, we affirm the judgment denying disqualification of the firm.
The relevant facts are essentially undisputed. In 1992, Ohnmacht first retained the firm to defend him in a civil rights complaint in federal district court. Ohnmacht was sued in that matter individually as well as in his official capacity as a detective with the Middletown Township Police Department. The plaintiff in the action alleged that Ohnmacht committed several Sixth Amendment violations during interviews the detective conducted of him in July 1989.
The firm assigned two attorneys, Michele A. Querques and Guy P. Ryan, to handle Ohnmacht's defense although Norman Hobbie, a partner in the firm, was attorney of record. According to Querques, she and Ryan, who is no longer with the firm, handled the "actual defense" of Ohnmacht and Hobbie did not participate in the "day-to-day defense." After a brief discovery period, the firm filed a motion resulting in the dismissal of the action in 1993. Both Querques and Ryan certified that they obtained no attorney-client confidences during that representation that are usable or relevant to defendant Bruno's case. The State does not contend otherwise.
In 1996, Ohnmacht suffered a work-related injury. He contacted Hobbie, who referred the matter to M. Scott Tashjy, an attorney in the firm who handles workers' compensation cases. Tashjy is the only attorney who handled Ohnmacht's claim.
The workers' compensation claim settled on June 24, 1997. Two days later, Tashjy sent Ohnmacht the following letter:
It was a pleasure meeting with you recently with regard to resolution of your Workers' Compensation claim. I would like to take this opportunity to thank you for expressing confidence in our firm, and it was a pleasure for me to handle your claim. As we discussed during our last meeting, you have two years from the date you receive your last disability benefit to reopen your case for an increase in permanent disability or to request additional medical treatment. Please keep this in mind. I would ask that, once you get your final permanent disability payment, you mark your calendar for 18 months in advance (as a precaution), to ensure that the two-year period does not pass unnoticed.
As always, I will be available for any questions you might have with regard to your case or any legal issues that confront you in the future. I wish you the best.
Thank you for your attention.
On September 29, 1997, Tashjy sent Ohnmacht another letter enclosing three blank applications for Review of Modification of Formal Award. Tashjy requested Ohnmacht to "sign where indicated and return same to me...." Ohnmacht did not respond.
On October 13, 1997, Tashjy sent Ohnmacht the following letter:
Please be advised that we have filed a Reopener Claim Petition with regard to your Workers' Compensation claim. Please contact my office and advise me specifically the complaints you have with regard to your leg and your neck. As you will recall, when we originally settled this matter, we reserved the right to reopen this claim, but we must indicate to the Court how your injuries have "worsened" since the date of the last Order in this matter. Thus, your input is essential. Please contact me at your convenience so we may discuss these issues.
Thank you for your attention.
Tashjy certified in connection with the State's disqualification motion that the first sentence of the letter contains a typographical error in that it should have read
*1139 "Please be advised that we have not filed a Reopener Claim Petition with regard to your Workers' Compensation claim." At argument before the trial court the State acknowledged the error, stating that it had "absolutely no basis to dispute that." Tashjy's certification makes sense in view of the fact that Ohnmacht did not return the signed forms necessary to institute such proceedings. Ohnmacht also failed to respond to this third letter.
On January 6, 1998, Tashjy sent Ohnmacht a fourth letter, stating:
Please contact my office to schedule an appointment which would be convenient for yourself regarding the reopening of your Workers' Compensation claim. If it is not convenient for you to meet at my office, please be advised that I would be happy to meet you at headquarters. I look forward to speaking with you soon.
Thank you for your attention.
Ohnmacht did not respond to this letter. A similar letter followed on January 26, 1998, which reads:
Please contact me at your earliest possible convenience so that we may schedule a mutually agreed upon date and time for an appointment so that we may discuss reopening your claim. In the alternative, please advise me as to your availability at Headquarters, and I will be happy to meet you there.
Ohnmacht neither responded to these letters nor met with Tashjy to discuss the workers' compensation matter until after defendant retained the firm on February 4, 1998.
The facts leading up to the firm's retainer by defendant are as follows. On January 18, 1998, the body of Robert James Gelhaus, Jr., was discovered in a taxicab. Ohnmacht, notwithstanding his longstanding friendship with defendant's family, was designated by the Middletown Township Police Department to serve as lead detective in the homicide investigation. According to Ohnmacht, he has conducted approximately twenty witness interviews as well as an interview of the defendant. He "anticipate[s]" that his interview of the defendant will be subject to a Miranda hearing. Additionally, he served as the affiant for several search warrants.
According to the firm, however, Ohnmacht simply took or witnessed statements of mostly collateral witnesses, and there was always a second officer with him. The firm also asserts that Ohnmacht witnessed "an exculpatory statement by [defendant], the admission of which the defense does not intend to challenge." The State does not contest these assertions.
On February 1, 1998, defendant was charged with the murder of Gelhaus, as well as felony murder, armed robbery, and possession of a weapon for an unlawful purpose. The complaint was signed by a detective other than Ohnmacht. On February 4, 1998, defendant retained the firm. The attorneys specifically assigned to defendant's case are Norman Hobbie and Edward Bertucio, Jr.
When Ohnmacht learned that defendant had retained the firm, he contacted Tashjy on February 13, 1998, to communicate his objection to the firm's representation of defendant.[1] Tashjy informed Ohnmacht that the firm was going to represent defendant notwithstanding his objection. Tashjy took the position that the firm had ended its representation of Ohnmacht with the settlement of the compensation matter on or about June 24, 1997. Ohnmacht informed Tashjy that he wanted the firm to continue representing him. He claimed in his certification that he believed up until that time that the firm would represent him in the reopening of his compensation claim. Ohnmacht has since retained another attorney to represent him in the reopener claim.
Ohnmacht subsequently communicated his objection to the Monmouth County Prosecutor's Office. Thereafter, a Monmouth *1140 County Assistant Prosecutor advised the firm that Ohnmacht "unequivocally objects" to its representation of defendant and requested that the firm advise as to its position regarding a conflict of interest or an appearance of impropriety. The firm responded that it had fully discussed the matter with defendant and his parents, all of whom instructed the firm to remain as counsel.
The State then filed a motion to disqualify the firm. The trial court denied the State's motion, finding as follows:
From my reading of the various certifications, neither the civil rights action or the workers' compensation case would have required the detective to reveal confidential information. As stated in the certifications of counsel, both representations appear to have been proforma in nature.
My review of the exhaustive certification gives rise to my conclusion that no member of the Giordano firm would now possess confidential information in reference to the detective that would serve to benefit defense counsel during cross-examination of that detective in the Bruno case if the State elected to call him to testify.
....
I find that there is no substantial relation between the prior representations of Detective Ohnmacht and the current representations of Gregory Bruno....
I'm essentially finding based upon my review of the file that the Giordano firm's representation of Detective Ohnmacht terminated on or shortly after June 24, 1997 coincidentally with the settlement of the workers' compensation claim.
The good practice letters cited by the State and sent by the Giordano firm to Detective Ohnmacht ... do not change my opinion.
None of those letters received a response from Detective Ohnmacht. These letters essentially outline the conditions should Ohnmacht seek to reopen his workers' compensation case. There was no response to Giordano that Ohnmacht sought to reopen his compensation case. And I, therefore, find that the compensation case was not an open matter at the time the Giordano firm was retained by the Bruno family.
Again, although that might change the criteria, any reliance on Needham[2] is not appropriate. The Needham case involved an attorney that had previously represented the State's key witness, Officer Warner. There is no indication here that Ohnmacht will be the State's (key witness).
....
Also, a distinguishing factor which I've previously cited is the intensity of the attorney/client relationship in Needham. Needham outlined a fact pattern much different than this. The attorney in the Needham case represented the key witness of the State in another criminal matter where the key witness was, in fact, accused of a crime.
It is much more likely there that the law firm obtained critical confidential information which would adversely affect the police officer's subsequent testimony in the criminal case. As previously stated, that's not so here.

I.
The State argues that the trial court erred in characterizing Ohnmacht as a former client and in thereby applying RPC 1.9 instead of RPC 1.7. The State maintains that the undisputed facts reveal that Ohnmacht was a current client at the time the firm agreed to represent the defendant. The firm, on the other hand, disagrees with the State's contention that the relationship between Ohnmacht and the firm is undisputed. It contends that the facts were "sharply contested" at the trial court as to whether Ohnmacht was a present or former client of the firm on February 4, 1998, whether he is a "key *1141 witness" in the criminal matter, and whether any facts exist to create a conflict of interest or an appearance of impropriety. The firm argues that Judge Kennedy's legal conclusions flowed from his resolution of the facts in its favor. As such, the firm maintains that this court must substantially defer to the trial court's findings of facts.
The two Rules of Professional Conduct[3] most relevant to this appeal are RPC 1.7, addressing the simultaneous representation of multiple clients, and RPC 1.9, addressing problems stemming from the representation of a former client in the course of representing a current client. The former rule provides in relevant part:
RPC 1.7 Conflict of Interest: General Rule
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:
(1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and
(2) each client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyers's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after a full disclosure of the circumstances and consultation with the client....
(c) This rule shall not alter the effect of case law or ethics opinions to the effect that:
(1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and
(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.
RPC 1.9 provides:
RPC 1.9 Conflict of Interest: Former Client
(a) A lawyer who has represented a client in a matter shall not thereafter:
(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or
(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.
(b) The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.
Determining which rule applies depends on whether Ohnmacht was a present or former client at the time the firm agreed to represent defendant. The trial court found that the firm's representation of Ohnmacht terminated on June 24, 1997, with the settlement of his compensation claim. Judge Kennedy characterized the letters the firm sent Ohnmacht as "good *1142 practice letters" that did not alter his opinion that the compensation case "was not an open matter at the time the Giordano firm was retained by the Bruno family." As such, the court applied RPC 1.9 and essentially held that the firm did not obtain information in connection with its former representation of Ohnmacht that it could use to the disadvantage of Ohnmacht in its current representation of the defendant. See RPC 1.9(a)(2).[4]
Our standard of review in this case is plenary. Where as here the trial judge had no factual disputes to resolve on credibility grounds and only legal conclusions to draw, we are not required to defer to the trial judge's findings. See Manalapan Realty v. Township Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995) (stating that "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference"). Nonetheless, we agree with Judge Kennedy's conclusion that Ohnmacht was not a client of the firm at the time the firm undertook the representation of defendant.
Unquestionably, when the final judgment was entered in Ohnmacht's compensation matter to his satisfaction, the firm was not bound to represent Ohnmacht in any future reopener proceeding and Ohnmacht was not bound to engage the firm. The firm's duty, at best, was to inform Ohnmacht of his right to reopen the case in the future and the prerequisites for doing so. Cf. Procanik v. Cillo, 206 N.J.Super. 270, 291, 502 A.2d 94 (Law Div.1985) (holding that a jury might find that the defendant attorneys in a legal malpractice action breached the post-termination duty to advise clients of a favorable subsequent decision that would have prevented their medical malpractice action from being time barred), rev'd in part on other grounds, 226 N.J.Super. 132, 543 A.2d 985 (App.Div.), certif. denied, 113 N.J. 357, 550 A.2d 466 (1988); State v. Bowens, 101 N.J.Super. 193, 202, 243 A.2d 847 (Law Div.1968) (finding, in criminal context, that "the duty of a lawyer, whether retained or appointed, to a defendant client who has been convicted does not end until he has discussed the availability and the advisability of an appeal with him...."); see also American Bar Association, Annotated Model Rules of Professional Conduct, comment on Rule 1.3 (1996) (stating that "if a lawyer has handled a judicial or administrative proceeding that produced a result adverse to the client but has not been specifically instructed concerning pursuit of an appeal, the lawyer should advise the client of the possibility of appeal before relinquishing responsibility for the matter"). The firm's letter to Ohnmacht of June 26, 1997, was the fulfillment of that duty.
Clearly, the letters that followed the June 26 letter can best be described as "marketing letters," that is, an effort by the firm to maintain Ohnmacht's interest in re-engaging the firm should he decide to pursue a reopener. While the conduct of an attorney may create a reasonable belief on the part of the client that the attorney has undertaken representation, the reasonableness of such a belief must be "based on the conduct of both parties, and a bright-line test is not available." Annotated Model Rules of Professional Conduct, supra, comment on Rule 1.9. The general rule is that an attorney/client relationship is not established unless "a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person." Restatement of the Law Governing Lawyers, § 26 (Proposed Final Draft No. 1 1996). Our Supreme Court has acknowledged that "`representation is inherently an aware, consensual relationship,' one which is founded upon the lawyer affirmatively accepting a professional responsibility.... [S]uch acceptance need not necessarily be articulated, in writing or speech but may, under certain circumstances, be inferred from the *1143 conduct of the parties." In re Palmieri, 76 N.J. 51, 58-59, 385 A.2d 856 (1978). Thus, contrary to the State's argument, the issue cannot be decided solely by considering the firm's conduct. Ohnmacht's conduct is equally important.
The firm's letters to Ohnmacht after obtaining the final award in the compensation matter were aimed at obtaining his signed authorization to proceed, as well as the necessary information to do so. There was no indication by the firm that it would take affirmative action on Ohnmacht's behalf without the authorization and information it requested. It is uncontroverted that Ohnmacht did not respond directly to any of the firm's requests. He did not sign the necessary authorizations, nor did he give the firm updated medical information. He did not even make a courtesy telephone call to Tashjy to explain his silence. Indeed, he did not contact Tashjy until after he learned that the firm had been engaged to represent defendant and, even then, he contacted Tashjy solely to register his objection to the firm's representation of Bruno.
Whether an attorney/client relationship has been established is sometimes a close question. In such cases, the issue has often turned on whether the attorney is in possession of confidential information gleaned from the prior representation of the client that can be used in the current representation to the former client's disadvantage. Annotated Model Rules of Professional Conduct, supra, comment on Rule 1.9. That is not the case here, and the State does not contend otherwise.
Accordingly, we conclude that on February 4, 1998, when the firm was contacted by defendant's father to represent defendant in the criminal matter, the firm could have reasonably concluded that it had not re-established its relationship with Ohnmacht and that it could undertake defendant's representation without violating the provisions of RPC 1.7. That is so, because the conduct of the firm and Ohnmacht considered as a whole did not evidence the aware consensual undertaking required to form an attorney/client relationship.

II.
The State argues in the alternative that the appearance of impropriety mandates the firm's disqualification. Our Supreme Court added this concept to the ABA Model Rules when our Rules of Professional Conduct were adopted. See RPC 1.7(c) and RPC 1.9(b). Thus, the appearance of impropriety must be addressed even in the absence of an actual conflict under either RPC 1.7 or RPC 1.9. Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 214, 536 A.2d 243 (1988); McCarthy v. John T. Henderson, Inc., 246 N.J.Super. 225, 232, 587 A.2d 280 (App.Div.1991). "The `appearance' doctrine is intended not to prevent any actual conflicts of interest but to bolster the public's confidence in the integrity of the legal profession." In re Petition for Review of Opinion No. 569, 103 N.J. 325, 330, 511 A.2d 119 (1986). The Court has generally held that the appearance of impropriety "must be something more than a fanciful possibility. It must have some reasonable basis." Higgins v. Advisory Comm. on Prof'l Ethics, 73 N.J. 123, 129, 373 A.2d 372 (1977). Without such an analysis, the appearance of impropriety standard, as one court put it,
serve[s] as a substitute for analysis rather than as a guide to it. It is easier to find a "doubt" than to resolve difficult questions of law and ethics. The disruption and prejudice that befall a client whose counsel is disqualified are reasons to avoid a hasty conclusion in favor of disqualification, based merely on a "doubt" about the propriety of the representation.

[Realco Servs., Inc. v. Holt, 479 F.Supp. 867, 872 n. 4 (E.D.Pa.1979).]
In determining whether a particular case creates an appearance of impropriety, courts judge the situation from the viewpoint of the public. In re Petition for Review of Opinion No. 569, supra, 103 *1144 N.J. at 331, 511 A.2d 119. In other words, courts "view the conduct as an informed and concerned private citizen and judge whether the reputation of the Bar would be lowered if the conduct were permitted." In re Opinion No. 415, 81 N.J. 318, 325, 407 A.2d 1197 (1979); see also RPC 1.7(c)(2) (providing that multiple representation is prohibited "in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients"). This inquiry is highly fact-sensitive and does not take place "in a vacuum." In re Opinion No. 653, 132 N.J. 124, 132, 623 A.2d 241 (1993) (quoting In re Opinion No. 415, supra, 81 N.J. at 325, 407 A.2d 1197).
The State primarily relies on State v. Needham, 298 N.J.Super. 100, 688 A.2d 1135 (Law Div.1996), as binding authority in the present matter.[5] In Needham, the trial court disqualified a defense attorney on the basis of an appearance of impropriety where the attorney also represented a police officer who was one of the key prosecution witnesses in the defendant's trial. Id. at 102, 688 A.2d 1135. The officer was one of several officers who had responded to the scene of the crime and had been threatened by the defendant. Ibid. Defendant's attorney had previously represented the officer in an indictable criminal matter in which the officer had been acquitted after a jury trial, as well as in a more recent internal affairs investigation that was resolved before culminating in a formal charge. Id. at 102-03, 688 A.2d 1135. The attorney's representation of the officer in the internal affairs investigation occurred during the same time period that defendant's charges arose. Id. at 103, 688 A.2d 1135.
The Needham court found that the prior representation of the officer created an appearance of impropriety because "the public could conclude that [the] officer [ ] may have unfairly aided defendant, that [the attorney] is not cross-examining [the] officer [ ] as vigorously as he would if there were no relationship between them, or that [the attorney] is using confidential information during his cross-examination of [the] officer [ ]." Id. at 104, 688 A.2d 1135. More specifically, the court found that the officer may not testify as vigorously as he otherwise would if not for the former attorney-client relationship with defense counsel. Ibid. One reason for this is that the officer may seek to ingratiate himself with the attorney should he again need his services. Ibid. Of similar concern was the possibility that, at the expense of the defendant, the attorney would not cross-examine the officer with as much intensity or vigor as he otherwise would in order to preserve their relationship and continue receiving his business. Id. at 105-06, 688 A.2d 1135. Finally, the court expressed concern that the attorney may use information from the prior representation of the officer to aid the defendant or, even if such information could not be used, the attorney may know other information that gives him influence over the officer or can be used in a subtle manner during cross-examination. Ibid. The court recognized that there are an "infinite number of confidences" that the attorney could have learned while defending the officer in an internal affairs investigation and a criminal action that could be exploited when the officer testifies for the State. Ibid.
*1145 Needham is factually distinguishable from the present matter and therefore inapplicable. The Needham court premised its holding primarily on the attorney's prior representation of the officer in a criminal matter that ended in an acquittal after a jury trial and in an internal affairs investigation. Based on that, the court found that strong possibilities of improprieties existed because of the extent of the former relationship between the officer and attorney and their possible attempts throughout trial, however subtle, to maintain that relationship intact for future dealings. Of critical concern was also the possibility that the attorney gained confidential information during his representation of the officer that could somehow be used during the cross-examination of the officer or in the attorney's trial strategy.
In contrast, the representation of Ohnmacht by the firm was limited in scope and therefore not subject to the same risks as in Needham. As stated earlier in this opinion, the State does not contend that the firm gained confidential information during the prior representation that could somehow be used to Ohnmacht's detriment during his cross-examination.
Moreover, because the inquiry is highly fact-sensitive, the informed citizen with full knowledge of the facts would conclude that there is no "high risk" of impropriety here as in Needham. For example, because the relationship between Ohnmacht and the firm ultimately terminated on a sour note, there is no concern that Ohnmacht will try to aid the defendant at trial or provide the firm with information about the State's trial strategy in order to ingratiate himself with the firm.[6] For that very reason there is no concern that the firm will not vigorously cross-examine Ohnmacht.[7] The firm, who without hesitation informed Ohnmacht that it did not consider him a client and that it intended to represent the defendant despite his protestations, certainly has exhibited no intention to preserve any relationship with Ohnmacht. There is therefore nothing to prevent Ohnmacht from professionally discharging his duties as lead detective and as a prosecution witness or the firm from zealously representing the defendant. As such, there is no "reasonable basis" for the conclusion that these facts create an appearance of impropriety. See Higgins, supra, 73 N.J. at 129, 373 A.2d 372.
Affirmed.
NOTES
[1] Ohnmacht initially certified that this conversation occurred on July 14, 1998. He later agreed that Tashjy's recollection of the date as being February 13, 1998, is correct.
[2] State v. Needham, 298 N.J.Super. 100, 688 A.2d 1135 (Law Div. 1996).
[3] The New Jersey Supreme Court has essentially adopted the ABA Model Rules of Professional Conduct, pursuant to both a recommendation by the Supreme Court Committee on the Model Rules of Professional Conduct and a revision by the Court. Pressler, Rules Governing the Courts, Introduction to Rules of Professional Conduct (1998).
[4] The provisions of RPC 1.9(a)(1) are clearly inapplicable. The firm is not representing Bruno in "the same or a substantially related matter."
[5] The other cases upon which the State relies are factually distinguishable. See, e.g., State v. Galati, 64 N.J. 572, 319 A.2d 220 (1974) (where the Court prohibited all future representations by PBA attorneys in matters where an officer from the same PBA chapter will be called to testify); State v. Catanoso, 222 N.J.Super. 641, 537 A.2d 794 (Law Div.1987) (where the court disqualified a defense attorney who had previously represented, in substantially related matters, a business of which the State's primary witness had been president); Advisory Opinion 404, 102 N.J.L.J. 205 (1978) (where the Ethics Committee found that an attorney could not represent a defendant where the complaining witness was a police officer whom the attorney previously represented on unrelated matters).
[6] Indeed, Ohnmacht has sought other counsel to file his reopener claim.
[7] In any event, the firm informed us at oral argument that discovery in the underlying matter to date indicates that it is highly unlikely that Ohnmacht will have to be cross-examined in a way that either his credibility or his investigative techniques will be called into question.