17 A.3d 213 (2011)
419 N.J. Super. 343
TWENTY-FIRST CENTURY RAIL CORPORATION, Plaintiff, and
Frontier-Kemper/Shea/Bemo, Joint Venture, Plaintiff-Appellant,
v.
NEW JERSEY TRANSIT CORP., Defendant, and
PB Americas, Inc., f/k/a/ Parsons Brinckerhoff Quade & Douglas, Inc., Defendant-Respondent.
No. A-0975-10T3.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 2011.
Decided February 3, 2011.
*216 Paul W. Killian (Akin, Gump, Strauss, Hauer & Feld, LLP) of the District of Columbia bar, admitted pro hac vice, argued the cause for appellant (Lowenstein Sandler, PC, attorneys; Steven E. Brawer, on the brief; Mr. Killian and Mark J. Groff (Akin, Gump, Strauss, Hauer & Feld) of the District of Columbia bar, admitted pro hac vice, on the brief).
Bruce D. Meller argued the cause for respondent (Peckar & Abramson, P.C., attorneys; Mr. Meller and Michael S. Zicherman, River Edge, of counsel and on the brief).
Before Judges R.B. COLEMAN, LIHOTZ, and J.N. HARRIS.
The opinion of the court was delivered by
JONATHAN N. HARRIS, J.A.D.
In this interlocutory appeal we address the question of attorney disqualification in the context of successive representationthat is, a lawyer's duty to a former clientunder the lens of City of Atlantic City v. Trupos, 201 N.J. 447, 992 A.2d 762 (2010).[1] From our plenary and de novo review of the record, we agree with the Law Division's ultimate conclusion that respondent's attorney was not required to be disqualified. Accordingly, we affirm the denial of appellant's motion to disqualify its former attorney.[2]

I.

A.
The five-count complaint that produced this litigation was filed on December 5, 2008. In it, plaintiffs Twenty-First Century Rail Corporation (21st Century) and Frontier-Kemper/Shea/BEMO Joint *217 Venture (FKSB) seek contract and tort remedies against defendants New Jersey Transit Corp. (NJT)[3] and PB Americas, Inc. (formerly known as Parsons Brinckerhoff Quade & Douglas, Inc.) (PB), respectively. Plaintiffs' contentions arise from a protracted and complex construction project connected with NJT's Hudson-Bergen Light Rail Transit System (the Light Rail System). Specifically, the four parties were participants in the execution of the N30 Tunnel Civil and Facilities Project (the N30 Project). At issue are allegations against NJT for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Claims of professional negligence and negligent misrepresentation are lodged against PB.[4]
The parties agree upon few things, but there is substantial accord regarding the nature of the N30 Project and the contractual relationships engendered thereby, as recited in FKSB's appellate brief:
The N30 Project is a portion of the [Light Rail System] project. The [Light Rail System] is an 18.5-mile light rail system that originates in Bayonne and runs north, terminating in North Bergen. The N30 segment of the [Light Rail System] is located at the northern end of the transit system and consists generally of enlarging and rehabilitating the preexisting Weehawken Tunnel, the construction of the Bergenline Station (within the tunnel), the construction of an above-ground plaza at Bergenline Avenue, the addition of an elevator shaft (from the plaza down to the Bergenline Station), and the integration of signaling and switchwork into the overall Train Control System.
The owner of the [Light Rail System] is defendant [NJT]. PB is the engineer of record on the N30 Project and, as such, was responsible for the tunnel design, engineering documents, and related interpretations. Plaintiff [21st Century] is the prime contractor on the [N30] Project. In January 2002 [21st Century]through its contracting arm, [Washington Group]entered into a subcontract with FKSB in connection with the N30 Project, whereby FKSB agreed to construct the civil, electrical, mechanical, and emergency portions of the tunnel, station, plaza, and elevators for the [N30] Project.

B.
The law firm of Peckar & Abramson, P.C. (P & A) represents PB in this litigation. This, however, was not P & A's first involvement with the N30 Project. In February 2004, P & A provided direct legal services to the "lead venture partner of [FKSB]"Frontier-Kemper Constructors, Inc. (FK Constructors)in connection with its concern about potential liability for construction delays associated with the N30 Project. In a certification in opposition to FKSB's motion to disqualify counsel, P & A partner Bruce D. Meller averred that he was informed that FK Constructors "had partners" and that P & A was to identify and bill the client as FK Constructors.
*218 In a March 8, 2004 "engagement letter and fee agreement" (the retainer agreement)addressed to and endorsed on behalf of FK Constructors by "Richard Raab, President"P & A thanked Raab "for the opportunity to work with [FK Constructors] and its tri-venture partners." The letter further expressed gratitude to Raab "for the privilege and opportunity to represent [FK Constructors] with respect to its disputes with [Washington Group] and on any other matter upon which we may be of service."
As part of the motion to disqualify P & A, Raab submitted a certification dated March 23, 2010, in which he stated that he was Vice President of FK Constructors, but "President of the Northeast Division Office of Frontier-Kemper Constructors, Inc." Any inconsistency in the nomenclature of the office held by Raab is overshadowed by his admitted lack of recollection of the March 8, 2004 retainer agreement with P & A until it was brought to his attention by one of FKSB's litigation attorneys almost six years later, in February 2010.
The total time expended by P & A in 2004, pursuant to its engagement by FK Constructors, consisted of approximately twenty hours. P & A charged FK Constructors $5,360.08 for the legal services provided. The services were billed by P & A to FK Constructors, and presumably paid in full.
An invoice dated March 31, 2004, reveals that P & A lawyersMeller and Charles F. Kenny, Jr.met with Raab on March 8, 2004,[5] and thereafter reviewed unspecified contractual provisions, engaged in indefinable legal research, conducted a handful of telephone conversations with Raab and another representative of FK Constructors, and "[p]repar[ed] [a] report letter." The culmination of P & A's retention was, in fact, a four-page letter dated March 24, 2004, authored by Kenny (the Kenny letter).[6]
The Kenny letter correctly identified that the immediate contracting partners for the N30 Project were FKSB and Washington Group, which was the contracting affiliate of 21st Century. The Kenny letter provided a thumbnail summary of those parties' subcontract and confirmed that FKSB was behind schedule in its assignments. Kenny candidly noted,
I also understand that there are numerous reasons for the delay, not the least of which is the onerous nature of the work.
. . . .
In addition, . . . you have been forced to deal with a local labor force that is inexperienced with tunnel projects of this type and magnitude.
. . . .
Other factors contributing to the delay are interferences from Weehawken Municipal officials who have failed to approve and/or issue the blasting permits *219 necessary, as well as design and constructability issues.
The Kenny letter neither explicated the "design or constructability issues," nor did it attribute any of them to PB or NJT.
Kenny noted that Washington Group had "informally advised" FKSB that FKSB would be held responsible for schedule delays and that Washington Group "may start to withhold ten percent from [FKSB's] payment requisitions." In light of these facts, Kenny provided his opinion on the risks facing FKSB, and its best course of action. Kenny based his analysis on decisional law, the General Conditions of the subcontract, the Project Labor Agreement (PLA), and Kenny's professional experience as a construction industry lawyer.[7] His ultimate advice was for the client to keep itself well-informed concerning NJT's measures (including its negotiations with respect to work schedules and any acceleration directives) vis-á-vis Washington Group, paying close attention to any actions by NJTsuch as withholding progress paymentsagainst Washington Group, which could then be imposed upon FKSB.
More than a year passed before P & A would again become involved in the N30 Project. In the summer of 2005, Meller received an unanticipated telephone call from attorney Paul W. Killian of Akin, Gump, Strauss, Hauer & Feld (Akin Gump). The two lawyers knew each other because they had worked cooperatively on a previous matter. Killian indicated that he represented FKSB and was interested in learning about Meller's dealings with representatives of Washington Group. He also solicited colleague-to-colleague advice from Meller about the possibility of FKSB entering into a so-called liquidating agreement with Washington Group. Meller readily advised against such an agreement and noted that his relationship with the Washington Group was no longer on good terms.
Although the certifications of Meller and Killian coalesced on most of the circumstances of their 2005 encounter, they diverged on one significant aspect: whether there was a discussion about P & A's 2004 representation of FKSB. Meller's certification stated, "Mr. Killian advised that he represented FKSB, and he acknowledged [P & A's] prior assignment for FKSB." Killian's certification stated the opposite: "[Meller] is incorrect that I either mentioned P & A's prior representation of [FK Constructors] or FKSB or that it was discussed."
The Law Division understood the significance of this disagreement and the court's need to resolve the factual dispute. With both Meller and Killian present at oral argument in the Law Division on the motion to disqualify P & A, the motion court sua sponte used the opportunity to clarify several fact issues. To that end, it explicitly administered a witness oath to enable Meller to testify, but curiously did not do the same for Killian. Nevertheless, the court extensively questioned both lawyers during the course of the hearing, and considered both to have testified under oath, even though that was only half correct. Notably, the motion court did not call upon either Kenny or Raab to testify in order to resolve their dispute about what was discussed at the March 8, 2004 meeting.
As a result of the court's inquiries as part of the disqualification motion, it concluded: *220 (1) "[P & A] received no confidential information that `can be used against' FKSB" and (2) "[s]uperficially, [P & A's] involvement in both its prior representation of plaintiff and its current representation touches the same subject matter: the N30 Project. That similarity, however, does not withstand closer scrutiny." Accordingly, the Law Division determined that there was no violation of RPC 1.9 because the two matters were not substantially related.
In the interest of completeness, the motion court further explored whether FKSB had waived the proscriptions of RPC 1.9 by not formally moving to disqualify P & A for almost seventeen monthsfrom November 2008 until the March 2010 filing of the disqualification motion. Although P & A had once again become involved with the N30 Project when it was retained by PB in October 2008,[8] the firm had no contact with FKSB or its attorneys for another month. From then on, the record indicates a consistent involvement by P & A on PB's behalf in connection with the N30 Project and this litigation.
On November 14, 2008, Killian called Meller (and followed up with a letter) after being alerted to Meller's involvement by PB's chief executive officer. Meller's purpose was to discuss a proposed tolling agreement involving NJT, PB, 21st Century, and FKSB. When the tolling agreement's terms could not be satisfactorily arranged, 21st Century and FKSB filed the instant complaint in the first week of December 2008.
Throughout 2009, P & A's alleged conflict of interest was not mentioned. The partiesthrough their respective attorneysembarked upon an exchange of pleadings, participated in large-scale mediation efforts, prosecuted and defended an affidavit of merit motion, and commenced discovery processes. During a document review conducted in February 2010, Mark J. Groff of Akin Gump found the 2004 Kenny letter and P & A's retainer agreement among FKSB's files. News of this finding made its way to Killian, and then to Raab, both of whom eschewed knowledge of P & A's earlier representation.[9] After Akin Gump's demand for P & A's "immediate withdraw[al] from the . . . litigation and representation" was followed by P & A's adamant refusal, FKSB filed a motion to disqualify on March 29, 2010. According to the Law Division, by the time the disqualification motion was argued, "[P & A] ha[d] spent over 2100 hours on this case, and PB ha[d] paid [P & A] over $520,000."
As part of its waiver analysis, the Law Division canvassed the copious documentary materials and limited testimonial evidence, and applied the five-factor test found in Alexander v. Primerica Holdings, Inc., 822 F.Supp. 1099, 1115 (D.N.J.1993). It found that four of the five factors militated against disqualification. The court's written opinion did not expressly state that FKSB had waived the conflict of interest; however, we believe that such determination *221 was the court's implicit conclusion.[10] It held that "this court believes that even if it is mistaken that the two matters are not substantially related, disqualification would still not be mandated." This appeal followed.

II.
RPC 1.9(a) sets forth the benchmark for decision-making in this appeal. It states: "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or substantially related matter in which that client's interests are materially adverse to the interests of the former client[.]" RPC 1.9(a). "[The RPC's] prohibition is triggered when two factors coalesce: the matters between the present and former clients must be `the same or . . . substantially related,' and the interests of the present and former clients must be `materially adverse.'" Trupos, supra, 201 N.J. at 462, 992 A.2d 762. It is from this framework that we explore the several legal principles applicable to the submissions of the parties.

A.
Appellate assessment of a trial court's decision granting or denying a motion to disqualify counsel presents a question of law subject to plenary de novo review. Id. at 463, 992 A.2d 762. ("[A] determination of whether counsel should be disqualified is, as an issue of law, subject to de novo plenary appellate review."); J.G. Ries & Sons, Inc. v. Spectraserv, Inc., 384 N.J.Super. 216, 222, 894 A.2d 681 (App.Div.2006). Ordinarily, where a motion court "had no factual disputes to resolve on credibility grounds and only legal conclusions to draw, we are not required to defer" to that court's findings. State v. Bruno, 323 N.J.Super. 322, 331-32, 732 A.2d 1136 (App.Div.1999) (citing Manalapan Realty v. Twp. Comm. 140 N.J. 366, 378, 658 A.2d 1230 (1995)).

B.
It is firmly decided that when a motion is brought to disqualify an attorney because of an alleged representation of conflicting interests in successive matters, "the former client should have the initial burden of proving that by application of RPC 1.9 it previously had been represented by the attorney whose disqualification is sought." Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 221-22, 536 A.2d 243 (1988). Furthermore,
[i]f that burden of production or of going-forward is met, the burden shifts to the attorneys sought to be disqualified to demonstrate that the matter or matters in which he or they represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought.
[Trupos, supra, 201 N.J. at 462-63, 992 A.2d 762.]
Nevertheless, the burden of persuasion as to all of the elements of RPC 1.9(a) remains with the movant, as it "`bears the burden of proving that disqualification is justified.'" Ibid. (quoting Div. of Youth & Family Servs. v. V.J., 386 N.J.Super. 71, 75, 898 A.2d 1059 (Ch.Div.2004)).
The Supreme Court in Trupos held that disqualification of counsel must be based in "fact," id. at 464, 992 A.2d 762, and that "surmise alone cannot support an *222 order of disqualification." Id. at 470, 992 A.2d 762. That said, we find nothing in Trupos abandoning the principle that facts in an ethics-related case may be determined through reasonable inferences, as well as by means of circumstantial evidence. See RPC 1.0(f); In re Cavuto, 160 N.J. 185, 195-96, 733 A.2d 1174 (1999); In re Garber, 95 N.J. 597, 606, 472 A.2d 566 (1984); Estate of Spencer v. Gavin, 400 N.J.Super. 220, 249, 946 A.2d 1051 (App. Div.), certif. denied, 196 N.J. 346, 953 A.2d 764 (2008).
Finally, Trupos explained that in practice:
[s]uch a motion should ordinarily be decided on the affidavits and documentary evidence submitted, and an evidentiary hearing should be held only when the court cannot with confidence decide the issue on the basis of the information contained in those papers, as, for instance, when despite that information there remain gaps that must be filled before a factfinder can with a sense of assurance render a determination, or when there looms a question of witness credibility.
[Trupos, supra, 201 N.J. at 463, 992 A.2d 762 (quoting Dewey, supra, 109 N.J. at 222, 536 A.2d 243).]

C.
"Disqualification of counsel is a harsh discretionary remedy which must be used sparingly." Cavallaro v. Jamco Prop. Mgmt., 334 N.J.Super. 557, 572, 760 A.2d 353 (App.Div.2000). Generally, motions to disqualify are disfavored because they "can have such drastic consequences." Rohm & Haas Co. v. Am. Cyanamid Co., 187 F.Supp.2d 221, 226 (D.N.J.2001).
A motion to disqualify requires the court to "balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." Dewey, supra, 109 N.J. at 218, 536 A.2d 243 (internal quotations omitted). Moreover, a party's "right to retain counsel of his or her choice is limited in that `there is no right to demand to be represented by an attorney disqualified because of an ethical requirement.'" Ibid. (quoting Reardon v. Marlayne, Inc., 83 N.J. 460, 477, 416 A.2d 852 (1980)).
Application of these principles requires careful scrutiny of the facts of each case to prevent unjust results. Because "New Jersey strictly construes RPC 1.9[,] . . . `[i]f there be any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification.'" Herbert v. Haytaian, 292 N.J.Super. 426, 438-39, 678 A.2d 1183 (App.Div.1996) (quoting Reardon, supra, 83 N.J. at 471, 416 A.2d 852) (internal citation omitted). Likewise, once a conflict of interest is determined to exist, the appropriate remedy is disqualification of the attorney, except in the interests of justice.

D.
In cases of successive representation an attorney may be disqualified pursuant to RPC 1.9(a) if: (1) the moving party is a former client of the adverse party's attorney; (2) there is a substantial relationship between the subject matter of the attorney's prior representation of the moving party and the issues in the present lawsuit; and (3) the interests of the attorney's current client are materially adverse to the moving party. See Trupos, supra, 201 N.J. at 451-52, 992 A.2d 762. We further note that RPC 1.10 provides that attorney disqualification pursuant to RPC 1.9 is imputed to any firm with which the disqualified attorney is associated. RPC 1.10(a).
*223 The parties agree that P & A had a previous attorney-client relationship with FKSB and that the interests of the parties are now materially adverse. Aside from the waiver issue, the parties also appear to concur that the only disputed factor is whether P & A's prior representation of FKSB is "substantially related" within the meaning of RPC 1.9(a) and Truposto its representation of PB in this case. Despite the apparent breadth of the phrase "substantially related," it has been honed in pragmatic application to provide for disqualification where:
(1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.
[Trupos, supra, 201 N.J. at 467, 992 A.2d 762.]
Thus, this case requires "a fact-sensitive analysis to ensure that the congruity of facts, and not merely similar legal theories, governs whether an attorney ethically may act adverse to a former client." Ibid.
The basic contours of what is "confidential information from the former client" are found in RPC 1.6: "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation." This concept is of broad application, as the Supreme Court has held:
[T]his Rule expands the scope of protected information to include all information relating to the representation, regardless of the source or whether the client has requested it be kept confidential or whether disclosure of the information would be embarrassing or detrimental to the client.
[In re Advisory Opinion No. 544 of N.J. Supreme Court Advisory Comm. on Prof'l Ethics, 103 N.J. 399, 406, 511 A.2d 609 (1986).]
Accordingly, client information communicated to an attorney from the client, even if otherwise disseminated or already in the public domain, retains the status of a confidence. See Kevin H. Michels, New Jersey Attorney Ethics, § 15:2-2(a) at 305-06 (2010). For purposes of a successive representation analysis, a side-switching lawyer is also governed by RPC 1.9(c), which does not limit its prohibition to confidential information. It proscribes conduct where a lawyer "use[s] information relating to the [former] representation to the disadvantage of the former client," and goes well beyond the protection of confidential information. See G.F. Indus. v. Am. Brands, 245 N.J.Super. 8, 14, 583 A.2d 765 (App. Div.1990). Further, we note that "[i]n general, RPC 1.6(a) imposes a broader duty of confidentiality than the attorney client privilege." Kevin H. Michels, New Jersey Attorney Ethics, § 15:2-2(b) at 306 (2010).

E.
We next turn to the jurisprudential method to be applied in conducting the fact-sensitive inquiry required by Trupos. The Court, noting the "paucity of authoritative precedent," looked to other jurisdictions, including the Seventh Circuit Court of Appeals, to craft a governing standard and methodology. Trupos, supra, 201 N.J. at 465-66, 992 A.2d 762. We believe that the Court's favorable citation to La Salle Nat'l Bank v. County of Lake, 703 F.2d 252 (7th Cir.1983) invites application of its practical methodological approach to the disputed issues in this case:
First, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it *224 must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.
[La Salle Nat'l Bank, supra, 703 F.2d at 255-56.]
With these principles in mind, we proceed to the plenary de novo review of the motion record.

F.

1.
The legal services provided by P & A to FKSB in 2004 were self-limited by FK Constructor's[11] narrow focus. It sought P & A's advice concerning a contractual problem that touched and concerned many of the participants in the N30 Project, and implicated long-term and wide-ranging disputes that were simmering for months, if not years. Nevertheless, only a scant few documents were provided to P & A for Kenny's review and analysis. According to Kenny, these documents included an Invitation to Bid, a Notice of Intent to Award the Subcontract, and a copy of "Book One," which was an unexecuted template of FKSB's and Washington Group's subcontract. Kenny asserts that he never received information about, or was given portions of, the subcontract that illustrated "the actual scope of work," "actual period for performance," or "even the [s]ubcontract price." As Kenny's certification noted, P & A was retained "to provide an analysis of contract rights" in the context of FKSB's inability to hew to its construction schedule, where "FKSB was without fault." Kenny was asked, "whether, under these facts, Washington Group . . . could withhold money under the contract or assess liquidated damages, and if [it] did, the legal result of that action."
The Kenny letter complied with the request for a limited contractual analysis, but also compiled the number of days that FKSB was behind schedule, highlighted several factors that contributed to the delay, and mentioned prominently Washington Group's threat to take action against FKSB if certain target dates were not satisfied. Additionally, the Kenny letter contradicted what Kenny himself indicated was the scope of the legal services, by assuming (in one portion of its analysis) that FKSB, not someone else, was "responsible for the current delays."
We conclude that based upon Kenny's certification and the Kenny letter itself, it is readily determinable that confidential information was conveyed by FKSB to P & A. Even if most of this information was independently verifiable as having been discussed at jointly-attended jobsite meetings, where NJT and PB representatives were present, and memorialized in minutes that were distributed to the participants in the N30 Project, we cannot ignore that Kenny learned everything he knew about the assignment from the lips of FKSB's representatives and the documents presented to him by them. These need-to-know data, filtered through an FKSB lens, comprised "information relating to the representation, regardless of the source," In re Advisory Opinion No. 544, supra, 103 N.J. at 406, 511 A.2d 609, and perforce, was entitled to be treated and protected as client confidences.
*225 Having concluded that P & A was in possession of FKSB's protected information does not end the inquiry. We must next determine whether the "confidential information from the former client . . . can be used against that client in the subsequent representation of parties adverse to the former client." Trupos, supra, 201 N.J. at 467, 992 A.2d 762. From our review of the record, we are unable to reach that conclusion.
FKSB contends that among the confidences shared by Raab were his concerns about missed construction targets and issues relating to "delay, contractual and impact issues." Raab's two certifications did not expound upon exactly what was said by him to P & A's lawyers, except in the most oblique terms. Raab's first certification made no reference whatsoever to the nature of the discussions among himself, Meller, and Kenny. Raab's reply certification stated the following:
[I]ndeed, during a meeting in Mr. Meller's and Mr. Kenny's offices on March 8, 2004, I discussed, in confidence, delay, contractual and impact issues including those that potentially could be the responsibility of co-plaintiff [Washington Group] or FKSB and which are relevant and material to the current litigation. We also discussed what I believed were design issues that would have been the responsibility of P & A's current client, PB.
It is unnecessary to resolve the embedded credibility dispute attendant to the disparate recollections between Kenny and Raab, because Raab's certification, on its face, is uninformative on the issue of whether anything communicated to P & A could be used against FKSB.
The motion record does not demonstrate an alignment between Raab's vague and conclusory "delay, contractual and impact issues including those that potentially could be the responsibility of co-plaintiff WGI or FKSB," and the myriad issues involved in the instant litigation. There is no principled way that we can connect the shared confidences to what the parties are currently battling about, unless we were to engage in prohibited speculation and conjecture. See Trupos, supra, 201 N.J. at 469, 992 A.2d 762. We cannot, and will not, make that unwarranted leap.

2.
Alternatively, FKSB asserts that even if confidential information is not at the core of the conflict of interest, P & A should still be barred from representing PB because "facts relevant to the prior representation are both relevant and material to the subsequent representation." Trupos, supra, 201 N.J. at 467, 992 A.2d 762. The Law Division did not directly address this contention, finding only the following:
The [2004] engagement was so brief that no factsother than the existence of the contract documents, and the "facts" that there were delays which FKSB and [Washington Group] were blaming each other for, which is true in all delayed projectscame into play. The primary "facts" in dispute in the FKSB v. PB litigationPB's alleged professional malpracticewere not mentioned at all. [P & A]'s engagement was limited to rendering a legal opinion on stipulated facts; it was not engaged to learn any facts.
In its appellate brief, FKSB criticizes the crabbed characterization of FKSB's claims against PB as limited solely to "professional malpractice," when it actually was pursuing a case "about construction delays and causes for such delays, including delays caused by, as mentioned in the [Kenny letter], `design and constructability issues,' which are clearly PB's responsibility." *226 The nomenclature used by FKSB and its expansive theory of liability is not a substitute for competent evidence demonstrating a relevant and material connection between P & A's two representations. We have scoured the record in vain for proof of such relevance and materiality.
We are not oblivious to the obvious: the N30 Project is the same project for both of P & A's representations, the parties are the same, the contracts are the same, and the existence of delays is the same. The mere numerosity of similarities, however, does not engender materiality or relevance. Missing is competent evidence of facts derived in 2004 that retain "a tendency in reason to prove or disprove any fact of consequence to the determination of the [present] action." N.J.R.E. 401.
We have also reviewed PB's separate defenses and counterclaims in a vain effort to detect how anything learned by P & A in 2004 fits the materiality and relevance calculus of Trupos. The discovery demands in this litigation concerning the substantive merits of the disparate claims are likewise unilluminating. Finally, stray comments in correspondence by P & A to the Law Division do not persuade us of the materiality and relevance between information learned in 2004 and the present litigational battleground.

3.
In conducting our review of the motion record, we recognize that doubts concerning side-switching conflicts of interest ordinarily "must be resolved in favor of disqualification," Herbert, supra, 292 N.J.Super. at 439, 678 A.2d 1183. Although we may harbor differences of perspective from that expressed by the Law Division, we reach the same ultimate conclusion: FKSB has failed to convince us of the substantial relatedness between P & A's 2004 representation and its present posture as PB's litigation counsel, within the meaning of RPC 1.9(a). We come to this conclusion without the necessity of comparing the credibility of the lawyer-actors (Meller and Kenny) with their former client's representative (Raab). If we had a need to resolve significant discordances in credibility, we would not hesitate to remand the matter for an evidentiary hearing, notwithstanding the admonition that such procedure should be a rarity. Trupos, supra, 201 N.J. at 463, 992 A.2d 762.

III.
Having concluded that disqualification is not warranted because of the lack of substantial relatedness in P & A's legal representations, we elect not to address in detail the alternate grounds assigned for that conclusion by the Law Division, that is, waiver or the existence of extraordinary circumstances. We note briefly, however, that at the time of argument of the disqualification motion, discovery had not yet expired, a trial date was not firmly scheduled, and the lion's share of legal work that had already been expended on the litigation was largely comprised of unsuccessful attempts to resolve the case through mediation. Under these circumstances, and based upon the limited findings of the motion court, we have strong reservations that either a waiver of the conflict was demonstrated or that extraordinary circumstances existed to validate P & A's continued representation of PB if RPC 1.9(a) had been violated.
We further observe that FKSB's motion to disqualify PB's counsel was made less than two months after the Kenny letter was unearthed, which was twelve months after PB filed its answering pleadings to the complaint. The lag in filing the disqualification motion does not appear to approach a magnitude of delay to constitute *227 a waiver of the conflict of interest, if it existed. Additionally, the record is barren of evidenceother than the assumed cost to replace P & A and the necessary time for substitute counsel to familiarize itself with the litigationto support the conclusion that extraordinary circumstances exist. See Kevin H. Michels, New Jersey Attorney Ethics, § 21:7-1 at 541-43 (2010).

IV.
In summary, we conclude that FKSB has failed to demonstrate that its former attorneys, P & A, should be prohibited from representing PB. P & A's successive representation in this context does not violate the strictures of RPC 1.9, and we are unable to discern any prejudice to FKSB. Therefore, we will not disturb PB's right to choose counsel of its choice.
Affirmed.
NOTES
[1] We note at the outset that Trupos is a watershed opinion, which again confirms the death of the appearance of impropriety standard that had been engrafted upon our Rules of Professional Conduct (RPC). Id. at 464-65, 992 A.2d 762. In explicating the current version of RPC 1.9, the Court crafted a forward-looking paradigm to be applied to side-switching lawyers. Notwithstanding the articulation of such new, clearly-defined approach to attorney conflicts of interest, we do not believe that Trupos swept aside all prior jurisprudence on the subject.
[2] We part company with the Law Division in its conclusion finding that appellant had waived the putative conflict of interest or that there were extraordinary circumstances to warrant overlooking it. This disagreement does not affect our disposition of the appeal.
[3] NJT submitted a letter indicating that it "does not intend to participate regarding the pending interlocutory appeal." 21st Century, represented by the same attorneys that represent FKSB, participated in filing the disqualification motion in the Law Division but is not involved in this appeal.
[4] PB has filed a counterclaim against plaintiffs, asserting a cross-claim against NJT, and maintaining a third-party action against URS Corporation Washington Group Division (formerly known as Washington Group International, Inc., which was formerly known as Raytheon Infrastructure, Inc.) (Washington Group).
[5] Raab sharply disagreed with the P & A lawyers about what was discussed at the meeting. Raab unequivocally certified that he disclosed a welter of generalized confidential information about "delay, contractual and impact issues including those that potentially could be the responsibility of co-plaintiff [Washington Group] or FKSB and which are relevant and material to the current litigation." P & A argues, in so many words, that Raab's recollection is a sham, fabricated after he had initially certified that he could recall neither the meeting nor the hiring of P & A.
[6] Meller was the P & A attorney who made the initial contact with Raab. Because the services sought by Raab "were not claim or litigation oriented," Meller introduced Kenny as the P & A lawyer who would be in charge of the services to be provided to FK Constructors.
[7] The record reflects that the documentary materials turned over to P & A by FK Constructors consisted of publicly available information obtainable "by a contractor on the job or a bidder." None of these documentary materials appear to be of a proprietary nature or subject to a privilege.
[8] Meller was contacted by PB in October 2008, to assist PB regarding a Comprehensive Change Order Request (CIC-80) made by 21st Century that alleged owner-caused delays and impacts to the N30 Project, and sought approximately $100 million in damages (later amended to approximately $117 million). Later, PB retained P & A for the current litigation.
[9] According to Killian, "[o]n February 22, 2010, I met with Mr. Raab and he informed me that he had forgotten about [P & A's] previous representation of FKSB on the [N30 Project] and that legal matters were primarily handled by Mr. Robert A. Pond who died in early 2008 or before litigation commenced."
[10] Although the Law Division also referenced the notion of extraordinary circumstances as an exception to disqualification, citing Kevin H. Michels, New Jersey Attorney Ethics, § 21:7-1 at 541-43 (2010), it did not expressly make any findings or conclusions regarding this concept.
[11] We again confirm that although retained by FK Constructors, P & A's mandate was to provide legal advice to the joint venture, FKSB, in the dispute with its subcontract partner, Washington Group.