292 N.J. Super. 426 (1996)
678 A.2d 1183
BETH HERBERT, PLAINTIFF-APPELLANT,
v.
GARABED HAYTAIAN, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 1996.
Decided July 25, 1996.
*429 Before Judges KING, KLEINER and HUMPHREYS.
*430 William C. Slattery argued the cause for appellant (Slattery & McElwee, attorneys; Mr. Slattery, of counsel and on the brief).
Paul M. Colwell argued the cause for respondent Garabed Haytaian (Wolff & Samson, attorneys; Mr. Colwell, of counsel; Mr. Colwell and Lori Ann Schiraldi, on the brief).
Rosemary Alito argued the cause for respondent State of New Jersey (McCarter & English; Ms. Alito, of counsel; Ms. Alito and Mark A. Schuman, on the brief).
HUMPHREYS, J.A.D.
Plaintiff alleges that the defendant Garabed Haytaian ("Haytaian") sexually harassed her from July 1994 to October 1995 while he was Speaker of the New Jersey General Assembly and she was employed in the Assembly Majority Office. She seeks compensatory and punitive damages and other relief from the State and Haytaian.
In March 1993, Neil Mullin ("Mullin"), at the request of Haytaian, agreed to undertake an investigation of alleged sexual harassment of State employees in the bi-partisan State Office of Legislative Services ("OLS"). Judge Ferentz found that this undertaking created an appearance of impropriety and entered an order disqualifying Mullin and his law firm from representing the plaintiff in this action. We granted plaintiff's motion for leave to appeal.
Mullin contends that: (1) he never represented Haytaian or the New Jersey Assembly Majority Office; and (2) during the time of his alleged representation of the State, he did not and "temporally" could not have participated in or acquired confidential information about this case.
After thorough consideration of the record and the arguments of counsel, we conclude that under the Rules of Professional Conduct ("RPC") both an actual conflict of interest and an appearance of a conflict of interest are present. The order of disqualification is affirmed.

*431 I.
In January 1993, defendant Haytaian was the Vice-Chairman of the New Jersey Legislative Services Commission ("Commission") in addition to his position as the Speaker of the New Jersey General Assembly. The Commission is the governing body of the OLS. The OLS is an agency of the Legislature which assists the Legislature in performing its functions. Haytaian also served as Chairman of the Budget and Personnel Committee ("Committee") of the Commission. The Committee has jurisdiction over OLS personnel matters.
In January 1993, Haytaian received an anonymous letter, allegedly from an OLS employee. According to the letter, a supervisory OLS employee was romantically involved with several women in the office resulting in problems for the other employees. The letter writer charged that there was "favoritism" and a "very hostile atmosphere" in the office. The letter writer stated that "someone may be able to sue the Legislature for allowing this to go on."
Barbara S. Hutcheon ("Hutcheon"), Chief Counsel for the New Jersey Assembly Majority Office, states the following in her certification. Haytaian directed her to retain outside counsel to conduct an investigation regarding the charges in the letter. On February 11, 1993, she contacted Mullin with respect to retaining his services as special counsel. She advised Mullin that, before she could discuss the matter with him, he would have to agree that the conversation would be confidential and protected by the attorney-client privilege; and that all "further discussions" between Mullin and her, "or work performed by [Mullin]" would also be privileged. Mullin agreed and also agreed to conduct the investigation.
She told Mullin that he was to conduct an investigation into allegations of a hostile work environment and sexual harassment which had been directed to the attention of Haytaian, and that Mullin was to render legal advice to the Committee in order to *432 safeguard its interests and the interests of Haytaian and the Legislature.
Thereafter she disclosed to Mullin both Haytaian's concerns and the concerns of the Committee regarding "the existence of the allegations and the need to respond to them." She explained to Mullin that Haytaian, who was not an attorney, had particular concerns. Specifically he was very concerned about the consequences of the allegation that a hostile work environment existed and about his duty and that of the Committee. She further disclosed to Mullin the Speaker's concerns regarding the need for outside counsel and the circumstances leading to the decision to hire outside counsel rather than proceeding in a different manner. Legal fees were also discussed.
By letter dated February 12, 1993, she forwarded to Mullin the anonymous letter and the subsequent correspondence between the Legislature and OLS. She also forwarded a copy of the Legislative Services Act of 1978, which established both the Commission and OLS, and a copy of the OLS staff directory. She thanked Mullin in the letter for "undertaking this matter."
She and Mullin discussed by telephone a number of other confidential matters including the specifics of the allegations and her views about their merits. They also discussed: (1) the identities of the parties involved; (2) the reasons why the Commission was hiring special counsel; (3) the proposed strategy devised by Haytaian and the Committee to deal with the matter including the persons involved in devising the strategy and the alternatives that were considered; and (4) the plans regarding how the Committee should handle such allegations including what steps it should take to prepare to handle such matters in the future.
On March 1, 1993, she spoke with Mullin again by telephone and sought his legal advice as to the legal obligations and duties of Haytaian and the Committee to investigate the anonymous allegations. Mullin advised her that, because of the gravity of the matter and the legal consequences of the failure to act, the Committee and Haytaian should conduct an investigation. She *433 and Mullin also discussed "(1) the steps to be taken in starting the investigation, (2) the manner in which the interviews would be handled, and (3) what was to be disclosed regarding the nature of the investigation."
Mullin asked for written confirmation of his retention. A letter dated March 1, 1993 was sent to Mullin. Haytaian signed the letter in his capacity as Chair of the Committee. Haytaian said in the letter:
This letter will serve to confirm that you have agreed to undertake a matter on behalf of the Budget and Personnel Committee of the Legislative Services Commission, as previously outlined.
Hutcheon again spoke to Mullin to discuss the specific strategies that should be put in place to carry out the investigation, i.e., the timing of the interviews, the identity and number of witnesses to be interviewed, the preparation and the contents of the report and the results of the work.
Haytaian wrote a second letter to Mullin also dated March 1, 1993 in which Haytaian states: "This letter will serve to confirm that you have agreed to undertake the above-referenced matter on behalf of the Budget and Personnel Committee of the Legislative Services Commission on the following terms and conditions." One of the terms and conditions was that "this arrangement will be ratified by the full Legislative Services Commission at their next regularly scheduled meeting."
Haytaian asked Mullin in the letter to:
Please confirm your willingness to undertake the engagement of these terms by signing and returning the enclosed copy of this letter.
I am certain you recognize the importance of this matter and can appreciate the Legislature's desire to apply a prudent manage[ment] approach to its use of special counsel.
The following appears on the bottom of the letter, "I hereby agree to the terms and conditions of the above letter." Mullin signed the bottom of the letter and returned it to Haytaian.
Mullin wrote a "PERSONAL AND CONFIDENTIAL" letter to Haytaian dated March 3, 1993, "RE: Investigation of Harassment *434 Allegation." Mullin stated in the letter that "I will proceed as follows, if it meets with your approval."
Mullin then stated at length how he would proceed. The letter contains the following:
5. The notes I keep will be attorney work product material. Likewise, I will transmit my report in the capacity of attorney to client, so the report too will be privileged and confidential. If the investigation identifies a substantial problem, I will, at your direction, prepare a final report documented with sworn or verbatim statements that will provide a basis for administrative action.
6. I will provide a legal framework as well as a factual framework for my conclusions both in the preliminary phase and the final phase. I will cite relevant case law for purposes of evaluating whether there is any misconduct and whether there is any exposure to the General Assembly as an institution.
Mullin also stated in the letter that, at the conclusion of the investigation, he would "write a preliminary report suggesting whether or not there appears to be unlawful harassment or a polluted work environment." Mullin closed his letter by stating: "Thank you for retaining our firm."
The Commission later decided that special counsel was not needed, and Hutcheon so advised Mullin on March 11, 1993. She asked that he return the documents sent to him previously and he did. She further states:
In all my conversations and dealings with Mr. Mullin, I engaged him as any client would engage his or her attorney. My understanding was that we had an attorney-client relationship. Thus, I was candid in everything I related to Mr. Mullin about the subject of representation. I understood, and believed that Mr. Mullin understood, that all matters we discussed were and remain privileged and confidential.
Mullin states in his certification that he "never represented, as counsel, the State of New Jersey or Garabed Haytaian." He states he never met Hutcheon or Haytaian and that neither he nor his firm have been paid for any professional services in connection with the matter. He states that he had only four phone calls with Hutcheon "of any substance" and did not receive any confidential information relevant to the current suit. Mullin maintains that his contacts with Hutcheon were "preliminary consultations" and that none of the documents support the passing of any confidences. In addition, plaintiff argues in her brief that Mullin could not have been retained without the approval of the Attorney General and *435 the Governor, see N.J.S.A. 52:17A-11 and -13, and the approval was not given.
In January 1996, plaintiff, represented by the Mullin firm, filed this action against the State of New Jersey and Haytaian. Plaintiff alleges in her complaint that from June or July 1994 to October 1995 Haytaian subjected her to "severe and pervasive sexual harassment" and that this "created a hostile, intimidating and offensive working environment."
She also alleges in her complaint that both of the defendants "failed to remediate the sexually hostile work environment"; and that the State of New Jersey is liable under the doctrine of respondeat superior because it "delegated to [Haytaian], ... the authority to control the work environment, was negligent or reckless, intended the conduct or the consequences, or the conduct violated a non-delegable duty."
Plaintiff contends in her complaint that the acts of the defendants constitute sexual harassment in violation of the Law Against Discrimination, N.J.S.A. 10:5-1 et seq. Plaintiff maintains she sustained "severe mental anguish, humiliation, pain and damage to her career and reputation."
Defendants contend that plaintiff's counsel had a press conference to announce the filing of the complaint. Mullin has been quoted in the newspaper as charging that the State has reacted to plaintiff's allegations with "institutional arrogance."
At oral argument on the State's disqualification motion, Mullin admitted that, in connection with the motion, he had disclosed to plaintiff as much of the information in the anonymous letter as was needed "so [plaintiff] could write a certification to help me defend her." He justified the disclosure because plaintiff "has a right to defend herself."

II.
Mullin contends that because he was not ultimately retained, an attorney client relationship was not created. We disagree. *436 It is indisputable that Mullin was consulted by Hutcheon on conducting an investigation of sexual harassment of employees in a State office, and that he agreed to undertake the investigation. It is reasonable to conclude that, during his telephone conversations with Hutcheon, which took place over a period of a month, Mullin received confidential information and the views and concerns of Hutcheon and Haytaian on the following subjects: (1) sexual harassment of State employees in OLS and perhaps in State government generally; (2) a hostile work environment in OLS and perhaps in State government generally; and (3) how the OLS and perhaps State government generally were responding or had failed to respond to sexual harassment and a hostile work environment. It is also reasonable to conclude that, during these conversations, Mullin expressed his own views and advice on these subjects.
Under these circumstances, an attorney-client relationship was clearly established. The creation of an attorney-client relationship does not rest on whether the client ultimately decides not to retain the lawyer or whether the lawyer submits a bill. When, as here, the prospective client requests the lawyer to undertake the representation, the lawyer agrees to do so and preliminary conversations are held between the attorney and client regarding the case, then an attorney-client relationship is created. In Bays v. Theran, 418 Mass. 685, 639 N.E.2d 720, 723-724 (1994), the court said:
`An attorney-client relationship need not rest on an express contract. An attorney-client relationship may be implied `when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.' . .. Such a relationship may be established through preliminary consultations, even though the attorney is never formally retained and the client pays no fee.'
[(Citations omitted).]
The Restatement of the Law Governing Lawyers (Proposed Final Draft No. 1) § 26 (1996) provides:
Formation of Client-Lawyer Relationship
A relationship of client and lawyer arises when:

*437 (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
(a) the lawyer manifests to the person consent to do so; or
(b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services;
Illustration one to comment (e) of that section of the Restatement reads as follows:
1. Client telephones Lawyer, who has previously represented Client, stating that Client wishes Lawyer to handle a pending antitrust investigation, and asking Lawyer to come to Client's headquarters to explore the appropriate strategy for Client to follow. Lawyer comes to the headquarters and spends a day discussing strategy, without stating then or promptly thereafter that Lawyer has not yet decided whether to represent Client. Lawyer has communicated willingness to represent Client by so doing. Had Client simply asked Lawyer to discuss the possibility of representing Client, no client-lawyer relationship would result.
See also United States v. Costanzo, 625 F.2d 465, 468 (3rd Cir.1980) (attorney-client relationship not dependent on the payment of a fee nor upon execution of a formal contract); In re Palmieri, 76 N.J. 51, 58, 385 A.2d 856 (1978) (an attorney-client relationship is an "aware, consensual relationship" founded upon a lawyer affirmatively accepting a professional relationship); In re Makowski, 73 N.J. 265, 269, 374 A.2d 458 (1977) ("[w]hether or not a fee is paid, one who assumes to give legal advice takes on the role of an attorney"); Tormo v. Yormark, 398 F. Supp. 1159, 1168 (D.N.J. 1975) (New Jersey law imposes duties incident to an attorney-client relationship upon one who "`assumes to give legal advice and counsel'"). Thus, an attorney-client relationship was present between Mullin and the State of New Jersey.
The existence of the attorney-client relationship places upon Mullin the responsibilities set forth in RPC. Under RPC 1.9 Mullin cannot represent a party in "a substantially related matter" in which that party's interests are "materially adverse to the interests of the former client" nor can he "use information relating to the representation to the disadvantage of the former client" except when permitted by RPC 1.6 or when the information *438 becomes generally known. See RPC 1.9; see also Reardon v. Marlayne, Inc., 83 N.J. 460, 474, 416 A.2d 852 (1980).
Further:
Where such substantially related matters are present or when a reasonable perception of impropriety exists, the court will assume that confidential information has passed between attorney and former client, notwithstanding the attorney's declarations to the contrary. The presumption of access to and knowledge of confidences may not be rebutted.
[Reardon, supra, 83 N.J. at 473, 416 A.2d 852.]
In applying these principles, the need to maintain the highest standards of the profession must be balanced against the rights of litigants to freely choose their attorneys. However, "[o]nly in extraordinary cases should a client's right to counsel of his or her choice outweigh the need to maintain the highest standards of the profession." Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 220, 536 A.2d 243 (1988); G.F. Industries v. American Brands, 245 N.J. Super. 8, 15, 583 A.2d 765 (App.Div. 1990).
In Dewey the Court said:
We cannot conceive of any situation in which the side-switching attorney or his new firm would be permitted to continue representation if, unlike the situation before us, the attorney had in fact actually represented the former client or had acquired confidential information concerning that client's affairs.
[Dewey, supra, 109 N.J. at 220, 536 A.2d 243.]
The Court also said:
If the court concludes that the side-switching attorney has not represented the former client, then it must determine whether the attorney whose disqualification is sought has `acquired information protected by RPC 1.6 and RPC 1.9(a)(2) that is material to the matter.' RPC 1.10(b). The burden at that point shifts to that attorney to show that no protected information has been acquired. See ABA Model Rule 1.10 comment, G. Hazard and W. Hodes, The Law of Lawyering, supra, at 617. Again, a hearing should be held only when it is indispensable to resolution of the issue.
[Id. at 222, 536 A.2d 243.]
New Jersey strictly construes RPC 1.9. See G.F. Industries, supra, 245 N.J. Super. at 13, 583 A.2d 765. Consequently, "[i]f there be any doubt as to the propriety of an attorney's *439 representation of a client, such doubt must be resolved in favor of disqualification." Reardon, supra, 83 N.J. at 471, 416 A.2d 852.
The two matters here are substantially related. Plaintiff charges in her complaint that a hostile work environment exists in her employment by the State of New Jersey. She seeks compensatory and punitive damages against both defendants. If she proves a hostile work environment, then she may be able to recover from the State more than merely "equitable damages." See Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 619-620, 626 A.2d 445 (1993).
To prove that the State had a hostile work environment, plaintiff will likely attempt to show that the State was negligent in failing to have in place, and to have publicized and enforced: "antiharassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms." See Lehmann, supra, 132 N.J. at 621, 626 A.2d 445.
The Court said in Lehmann that an employer may be vicariously liable for compensatory damages "if the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims." Id. at 624, 626 A.2d 445. An employer may also be liable if the employer knows or should know of sexual harassment and "fails to take effective measures to stop it...." Id. at 623, 626 A.2d 445; see also Payton v. N.J. Turnpike Auth., 292 N.J. Super. 36, 46, 678 A.2d 279 (App.Div. 1996). The court said in Payton that a "core inquiry" is whether the employer had an effective, properly enforced anti-harassment program. Payton, supra, 292 N.J. Super. at 46, 678 A.2d 279. The timeliness of an employer's response to an employee's complaint is an important element in determining the effectiveness of an anti-harassment program. Ibid. Further, the employer may be liable for punitive damages where the "`wrongdoer's conduct is especially egregious'" and there is "participation by upper management or willful indifference." Lehmann, supra, 132 N.J. at 624-625, 626 A.2d 445 (citation omitted).
*440 Mullin's conversations with Hutcheon should be helpful to plaintiff in learning: (a) Whether the State had effective anti-harassment policies, structures, training, monitoring, investigatory and remedial procedures in place in 1993, the year before Haytaian's alleged harassment of plaintiff began; (b) If not then in place, did the State afterwards act promptly to put them in place; (c) Did the State know or should it have known of sexual harassment in State offices and fail to take effective measures to stop it; (d) Was there participation by "upper management" or "willful indifference" regarding especially egregious wrongful conduct, in which case punitive damages may be recovered. Thus, Mullin's confidential conversations with Hutcheon should significantly assist plaintiff in establishing the State's potential liability for not just equitable damages but for compensatory and punitive damages as well. Under these circumstances, Mullin's representation of plaintiff is "materially adverse" to the State. See RPC 1.9.
The existence of a conflict is also shown by Mullin's conduct in opposing the disqualification motion. He has admitted that he gave plaintiff confidential information obtained from his former client in order to permit plaintiff to defend herself against the disqualification motion. This was a clear breach of his duty to his former client to preserve the former client's confidences. His conduct shows that, if the interests of his former client and present client conflict, he gives preference to the interests of his present client. This conduct is exactly what the RPC were designed to prevent.
Moreover, "the attorney's obligation to preserve the client's confidences" is of "fundamental importance." Dewey, supra, 109 N.J. at 217, 536 A.2d 243. As stated in Reardon:
The ethical obligation of every attorney to preserve the confidences and secrets of a client is basic to the legitimate practice of law.... Persons who seek legal advice must be assured that the secrets and confidences they repose with their attorney will remain with their attorney, and their attorney alone. Preserving the sanctity of confidentiality of a client's disclosures to his attorney will encourage an open atmosphere of trust, thus enabling the attorney to do the best job he can for the client.
[Reardon, supra, 83 N.J. at 470, 416 A.2d 852.]
*441 Clearly, an actual conflict of interest is present here.

III.
Aside from the actual conflict, an appearance of impropriety is present. Mullin cannot represent plaintiff if his representation creates an appearance of impropriety, i.e., an "ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interests of one of the clients." RPC 1.7(c)(2); see also RPC 1.9(b).
The appearance of impropriety must be something more than a fanciful possibility. It must have a reasonable basis. The conclusion must be based upon a careful analysis of the record. See McCarthy v. John T. Henderson, Inc., 246 N.J. Super. 225, 232-233, 587 A.2d 280 (App.Div. 1991). "Under any circumstances the disqualification of an attorney in pending litigation does a great disservice to the affected client." Dewey, supra, 109 N.J. at 221, 536 A.2d 243.
We have carefully analyzed the record and are satisfied that an appearance of impropriety is present. Mullin was asked by Haytaian on behalf of the State to undertake an investigation of sexual harassment in a State office under Haytaian's oversight. Mullin likely received confidential information as to sexual harassment and the possible existence of a hostile work environment in that office. He also likely received confidential information about the knowledge, concerns and views of Haytaian on those subjects. A few years later Mullin represents a plaintiff in an action charging Haytaian and the State with sexual harassment and creating and permitting a hostile work environment. Such a setting is permeated with the appearance of impropriety. The fact that different State offices are involved is not significant. The "average citizen" is not likely to perceive "any distinctions or appreciate the bureaucratic structuring of responsibility." See In *442 re Petition for Review of Opinion No. 569, 103 N.J. 325, 331, 511 A.2d 119 (1986).
Avoiding the appearance of impropriety is extremely important to our legal system. As stated in Reardon:
The public display of an attorney representing conflicting interests, regardless of the attorney's good faith, may prevent the prospective client from completely confiding in his attorney.... It likewise would tend to erode the public's confidence in the bar.
[Reardon, supra, 83 N.J. at 470, 416 A.2d 852 (citation omitted).]
The appearance of impropriety here is clear. Mullin would be disqualified for that reason even if no actual conflict existed.
In sum, the facts show both an actual conflict of interest and an appearance of impropriety. Disqualification must follow in order to uphold the high ethical standards of the New Jersey legal system.
Affirmed.