NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3793
_____

MARK A. SPEENEY; DAVID M. OESTREICHER; ADRIANA GRECI GREEN

v.

RUTGERS, THE STATE UNIVERSITY; WILLIAM POWERS;
CARPENTER, BENNETT & MORRISSEY; IRVING HURWITZ;
LINDA CELAURO; KATICH, WERSE & PETILLO; DOUGLAS KATICH;
STANLEY WERSE; ALMAN & MICHAELS; EMILY ALMAN, jointly and severally

David M. Oestreicher; Adriana Greci Green,
Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.N.J. No. 2-02-cv-00959)
District Judge: Honorable Madeline C. Arleo
_____

Submitted under Third Circuit L.A.R. 34.1(a)
October 6, 2016
_____

Before: SHWARTZ, COWEN, and ROTH, Circuit Judges.
(Filed: December 8, 2016)

_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not
constitute binding precedent.

SHWARTZ, Circuit Judge.

David M. Oestreicher and Adriana Greci Green ("Plaintiffs") appeal the District Court's order granting summary judgment for the law firm of Carpenter, Bennett & Morrisey and attorneys Linda Celauro and Irving Hurwitz (collectively, "CBM") on Plaintiffs' legal malpractice and breach of fiduciary duty claims. For the reasons set forth herein, we will affirm.

I

Plaintiffs earned doctorate degrees in anthropology from Rutgers University. While attending Rutgers, Oestreicher complained that Professor William K. Powers falsely accused him of plagiarism, and Green accused Powers of sexual assault. On the basis of these and other student complaints, Rutgers initiated detenure proceedings before a Rutgers faculty panel and retained CBM to represent the University's President in those proceedings.

Plaintiffs participated as witnesses in the proceedings and met with CBM beforehand to discuss their testimony. Plaintiffs did not enter into any written agreement with CBM, pay CBM, or receive any bills from CBM, and received no express advice that CBM represented them. Celauro, the lead attorney, however, told them that she was "available to answer any questions that [they] may have regarding the hearings," J.A. 310, 1747, and Jean Ambrose, Rutgers's Assistant Vice President for Faculty Affairs, told Plaintiffs that they did not need their own lawyers. Oestreicher nevertheless consulted his father, an attorney, for advice regarding his testimony at the proceedings

2

and the possibility of a lawsuit against Rutgers and/or Powers. Green consulted attorney Emily Alman for similar advice and also retained Alman to represent her in connection with related litigation involving Powers. Both Oestreicher's father and Alman were frequently present during the proceedings, which lasted several weeks, and they informed the faculty panel that they represented Oestreicher and Green, respectively.[1] During the proceedings, Celauro explicitly stated that she did not represent Plaintiffs, and multiple times referred to CBM as representing the University's President.

In 1998, after CBM presented the charges, but before the faculty panel issued a recommendation to the Rutgers Board of Governors, Rutgers and Powers entered a settlement agreement (the "Agreement") that did not require Powers to retract the plagiarism accusations, issue a public apology to Plaintiffs, or compensate them financially. Dissatisfied with the Agreement, which they did not learn about until after it had been executed, Plaintiffs filed suit against Rutgers, Powers, and CBM, among others, seeking multiple forms of relief, including compensatory damages.

In an Amended Complaint removed from the New Jersey Superior Court to the District Court in 2002, Plaintiffs alleged that CBM informed them, "or led [them] to believe," that it represented them in connection with the Powers dispute. J.A. 238, 1705. They raised two claims at issue here: first, that CBM engaged in legal malpractice by representing both them and Rutgers, given the potential conflict of interest; and second,

---

[1] As discussed infra, Oestreicher's father submitted a letter to the faculty panel in which he characterized himself as his son's attorney. Alman spoke on Green's behalf at the proceedings and referred to Green as her client.

that CBM breached its fiduciary duty by failing to "attain[] financial, equitable[,] and administrative relief" for them in negotiating the Agreement, J.A. 229.

In 2005, following the District Court's denial of CBM's first motion for summary judgment,[2] Plaintiffs moved to disqualify CBM as counsel for Rutgers. The District Court denied the motion following an evidentiary hearing, holding that there was neither an express nor an implied attorney-client relationship between Plaintiffs and CBM and thus CBM's representation of Rutgers did not create a conflict of interest. Several

_____

[2] The District Court initially granted CBM's first summary judgment motion with respect to the legal malpractice claim, but subsequently vacated that ruling in response to Plaintiffs' motion for reconsideration and denied the motion for summary judgment. This ruling does not constitute law of the case precluding summary judgment now. A prior denial of summary judgment should not be viewed as law of the case since "[s]uch a denial merely postpones decision of any question; it decides none. To give it any other effect would be entirely contrary to the purpose of the summary judgment procedure." Dessar v. Bank of Am. Nat'l Tr. & Sav. Ass'n, 353 F.2d 468, 470 (9th Cir. 1965); see also Hoffman v. Tonnemacher, 593 F.3d 908, 911 (9th Cir. 2010) ("[T]he denial of summary judgment does not preclude a contrary later grant of summary judgment."); Aycock Eng'g, Inc. v. Airflite, Inc., 560 F.3d 1350, 1356 (Fed. Cir. 2009) ("[T]he law of the case doctrine . . . simply does not apply to a denial of summary judgment."); Bethlehem Steel Exp. Corp. v. Redondo Constr. Corp., 140 F.3d 319, 321 (1st Cir. 1998) (observing that "the 'law of the case' doctrine has not been construed as an inflexible straightjacket," and holding that the denial of the summary judgment motions at issue did "not constitute the law of the case" (citation omitted)); Preaseau v. Prudential Ins. Co. of Am., 591 F.2d 74, 79-80 (9th Cir. 1979) ("[A]n order denying a motion for summary judgment is generally interlocutory and 'subject to reconsideration by the court at any time.'" (quoting Dessar, 353 F.2d at 470)); cf. Schor v. Abbott Labs., 457 F.3d 608, 615 (7th Cir. 2006) (observing that "[a]lthough it is possible to imagine circumstances under which the denial of a motion to dismiss may conclusively resolve some concrete issue," that is not always the case). Moreover, additional depositions, production of evidence reflecting settlement negotiations between CBM and Powers, and the disqualification hearing, the purpose of which was to determine whether Plaintiffs and CBM had entered into an attorney-client relationship, occurred after the District Court denied summary judgment. Given the development of additional evidence, reconsideration of the denial was appropriate. See Hamilton v. Leavy, 322 F.3d 776, 787 (3d Cir. 2003) ("Reconsideration of a previously decided issue may . . . be appropriate in certain circumstances, including when the record contains new evidence.").

months later, the District Court granted CBM's second motion for summary judgment, concluding that Plaintiffs' legal malpractice claim was foreclosed by the law of the case doctrine based on its finding at the disqualification hearing. The District Court also found that Plaintiffs failed to show that CBM owed them a fiduciary duty. We reversed, holding that Plaintiffs did not have "a full and fair opportunity to litigate their malpractice and breach of fiduciary duty claims" during the disqualification hearing, and thus the District Court erred in applying the law of the case. J.A. 115. We also urged the District Court to consider any new evidence Plaintiffs "were unable to present at the disqualification hearing." J.A. 123.

Following additional discovery, CBM moved for summary judgment a third time. The District Court granted the motion, holding that "there is no objectively reasonable basis to conclude" that there was either an express or implied attorney-client relationship between Plaintiffs and CBM, and thus Plaintiffs could not sustain a legal malpractice claim. App. 14. The District Court also held that because "there are no facts to support the finding that CBM should have known that Green or Oestreicher would rely on them or that such reliance was foreseeable," CBM owed them no fiduciary duty. App. 23. Plaintiffs appeal.

II

Plaintiffs argue that they "had an attorney-client and/or a fiduciary relationship with CBM," and thus the District Court erred in granting summary judgment for the law

5

firm on their legal malpractice and breach of fiduciary duty claims. Appellants' Br. 26. We address these claims in turn.[3]

A

The elements of a legal malpractice claim are: "(1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of such duty; and (3) proximate causation." DeAngelis v. Rose, 727 A.2d 61, 67 (N.J. Super. Ct. App. Div. 1999). Under New Jersey law, an attorney-client relationship may be express or implied. See Herbert v. Haytaian, 678 A.2d 1183, 1188 (N.J. Super. Ct. App. Div. 1996).

An express attorney-client relationship "is created with respect to a particular matter" when "a person manifests to a lawyer that person's intent that the lawyer provide legal services" and "the lawyer manifests to the person consent to do so." Dixon Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151, 169 (3d Cir. 2001) (quoting Restatement (Third) of the Law Governing Lawyers § 26 (Proposed Final Draft No. 1, 1996)). An implied attorney-client relationship is created when "a person manifests to a lawyer the person's intent that the lawyer provide legal services to the person," "the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably

---

[3] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's decision on summary judgment, which involved the interpretation and application of New Jersey law, de novo. Dixon Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151, 161 (3d Cir. 2001). Summary judgment is appropriate where, drawing all reasonable inferences in favor of the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable jury could find for the" non-movant. Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

6

should know that the person reasonably relies on the lawyer to provide the services." Id.; accord Herbert, 678 A.2d at 1188.

Plaintiffs do not dispute that they did not enter into any written agreement with CBM and were not expressly advised by CBM that the law firm represented them. Nor do they dispute that they received no bills from CBM, made no payments to CBM, and "did not hire, and could not fire, CBM," as the District Court observed. App. 21 n.12. While we recognize that an attorney-client relationship is not dependent on the payment of a fee or execution of a written contract, see United States v. Costanzo, 625 F.2d 465, 468 (3d Cir. 1980), we agree with the District Court that no reasonable jury could conclude Plaintiffs entered into an express attorney-client relationship with CBM.

We reach the same conclusion with respect to the existence of an implied attorney-client relationship. Even assuming Plaintiffs manifested an intent to enter into an attorney-client relationship with CBM and CBM failed to manifest a lack of intent to do so, the record does not demonstrate that Plaintiffs relied on CBM or that CBM knew or should have known that they did. To begin, while Plaintiffs assert that they relied on CBM to "protect their interests," Appellants' Br. 51, Reply Br. 14, and claim in the Amended Complaint that CBM improperly failed to attain equitable, financial, and administrative relief for them in negotiating the Agreement, the record is devoid of evidence that Plaintiffs broached the subject of obtaining financial or other relief with CBM, or discussed with the law firm potential lawsuits against Rutgers or Powers. The record shows that Plaintiffs relied on their own lawyers for such matters, instead. Specifically, Oestreicher testified that he discussed these issues with his father, whom he

referred to as his attorney during a discussion with CBM, while Green indicated that Alman—on whom Plaintiffs initially relied to file suit against Rutgers and Powers in 1998—periodically provided her with legal advice related to the proceedings and her "situation with Dr. Powers generally." J.A. 1799; cf. In re Silverman, 549 A.2d 1225, 1241 (N.J. 1988) (per curiam) (finding the existence of an attorney-client relationship with respect to a particular transaction was "rebutted" by the fact that the purported client ultimately retained a different lawyer to advise on the matter and before that had "sought other outside legal . . . advice").

In any event, any reliance by Plaintiffs on CBM for their individual claims would not have been reasonable for two reasons. First, Celauro communicated to them that she was "available to answer any questions that [they] may have regarding the hearings," J.A. 310, 1747 (emphasis added), the purpose of which, Plaintiffs were aware, was to secure the faculty's recommendation for Powers's termination.[4] Ambrose likewise informed Plaintiffs via letter that Celauro and CBM were "[t]he presenters of evidence in support of the President's charges" against Powers and that the University would be working with CBM "to prepare for the[] hearings." J.A. 307-08. Neither CBM nor Ambrose indicated that CBM had been hired to pursue Plaintiffs' personal causes of action or otherwise help them obtain individualized relief. Second, as discussed above, Celauro explicitly stated

---

[4] In testimony in connection with this litigation, Oestreicher described CBM as "the attorneys that the university had provided to prosecute the case" against Powers, J.A. 419, and that he understood that the faculty panel was limited to determining whether Powers should be dismissed. Green testified similarly that she understood that "the hearing was supposed to result in a recommendation by the panel [on the dismissal of Powers] to the board of governors." J.A. 1443.

during the proceedings that she did not represent Plaintiffs, J.A. 313 (Celauro stating: "I don't represent Adriana Greci Green, nor do I represent . . . any of the other witnesses, I represent the President of the University."), referred to herself as the "President's representative," J.A. 1448, and introduced co-counsel Hurwitz to the faculty panel as "co-counsel on behalf of the President," J.A. 321.[5]

Finally, no reasonable jury could conclude that CBM knew or should have known that Plaintiffs relied on it for the provision of legal services. As noted earlier, Plaintiffs did not hire and had no agreement with CBM. Moreover, Plaintiffs had their own counsel, a fact of which CBM was aware. Both Oestreicher's father and Alman were frequently present during the proceedings. In fact, Green's testimony was scheduled around Alman's availability, Alman was introduced to the faculty panel by Celauro as "attorney for Adriana Greci Green," and she referred to Green during the proceedings as her client, J.A. 312. In addition, Oestreicher's father submitted a letter to the faculty panel, on which Celauro was copied, in which he stated: "I write this letter as Attorney for my son David Oestreicher." J.A. 338.

Plaintiffs claim that, notwithstanding the above, material disputed facts exist evidencing the formation of an implied attorney-client relationship between themselves and CBM. In particular, they point to Ambrose's assurances that they did not need their own lawyers, a document authored by Oestreicher on which Celauro wrote

_____

[5] During the proceedings, Celauro also stated, in response to Powers's attorney's request to question another student, that counsel was "free to ask," because the students "[are] not [her] client[s]," and she "[is] not their attorney." J.A. 319. Another student (and former plaintiff) Mark Speeney testified that Plaintiffs were present when Celauro made this statement.

9

"ATTORNEY-CLIENT PRIVILEGE" during a pre-hearing meeting, J.A. 294,[6] and draft settlement agreements in which CBM proposed that Powers apologize to and retract statements he made about certain students, including Oestreicher and Green.

In light of the overwhelming evidence to the contrary, we disagree that these facts could lead a reasonable jury to find that an implied attorney-client relationship existed.[7] It is true that Ambrose assured Plaintiffs that they did not need their own attorneys. But as discussed above, she did not indicate to them that Rutgers had retained CBM to represent them personally, and Plaintiffs did, in fact, obtain outside lawyers. And though Celauro may have written "ATTORNEY-CLIENT PRIVILEGE" on Oestreicher's document while meeting with him, Oestreicher admitted that such notation "was not significant to [him] at the time," J.A. 879, and thus the notation seemingly did not convey that CBM represented him. Moreover, such notation alone does not guarantee confidentiality, accord Costanzo, 625 F.2d at 468 (observing that "a communication is not privileged simply because it is made by or to a person who happens to be a lawyer" (citation and alteration omitted)), let alone establish an attorney-client relationship. Lastly, that CBM attorneys included provisions in draft settlement agreements related to

---

[6] Although Celauro denies writing this, we assume that she did in accordance with the summary judgment standard.

[7] We also reject Plaintiffs' argument that the expert reports, one of which concludes that an attorney-client relationship was formed between Plaintiffs and CBM and the other of which reaches the opposite conclusion, preclude summary judgment. Whether there is a genuine dispute of material fact relating to the formation (or not) of an attorney-client relationship is for the Court, not the experts, to determine. Moreover, we note that to the extent Plaintiffs seek to rely on the New Jersey Rules of Professional Conduct to support their claims, "those rules do not, in themselves, create a duty, and a violation of those rules, standing alone, does not form the basis of a cause of action." Banco Popular N. Am. v. Gandi, 876 A.2d 253, 266 n.8 (N.J. 2005).

specific students does not evidence the existence of an attorney-client relationship, particularly as Oestreicher testified that he never consulted CBM about a potential lawsuit against Powers and understood CBM to be representing him "only in connection with the hearing," J.A. 402, and Green testified that she "[didn't] think" that CBM provided her any legal advice or consultation outside of preparation for the proceedings, J.A. 1803.

In summary, the record does not demonstrate a genuine dispute; rather, it is clear that no reasonable jury could find that Plaintiffs and CBM entered into either an express or an implied attorney-client relationship. Because "[t]he existence of an attorney-client relationship is, of course, essential to the assertion of a cause of action for legal malpractice," Froom v. Perel, 872 A.2d 1067, 1074 (N.J. Super. Ct. App. Div. 2005), and none existed here, the District Court did not err in granting summary judgment for CBM on this claim.

B

We next address Plaintiffs' breach of fiduciary duty claim. A lawyer may owe a fiduciary duty to a non-client "when and to the extent that the lawyer . . . invites the non-client to rely on the lawyer's opinion or provision of other legal services, the non-client so relies, and the non-client is not . . . too remote from the lawyer to be entitled to protection." Petrillo v. Bachenberg, 655 A.2d 1354, 1359 (N.J. 1995) (citation omitted). As explained above, no reasonable jury could conclude that Plaintiffs reasonably relied on CBM to advance their individual interests apart from what was needed to support Rutgers's legal position. We therefore conclude that CBM did not owe Plaintiffs a

11

fiduciary duty, and the District Court did not err in granting summary judgment for CBM on Plaintiffs' breach of fiduciary duty claim.[8]

III

For the foregoing reasons, we will affirm the order of the District Court granting summary judgment for CBM.

---

[8] Plaintiffs suggest that because they shared confidential information with CBM, CBM owed them a fiduciary duty, even in the absence of an attorney-client relationship. As discussed above, a fiduciary duty in this context is owed only where the non-client relies on the lawyer, and Plaintiffs have not shown that they relied on CBM for the relief they claim CBM failed to attain for them. Thus, the provision of confidential information alone does not give rise to an actionable duty.