**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0006-23

ALIYAH HARMON, an
Individual,

      Plaintiff-Appellant,

v.

BMW OF NORTH AMERICA,
LLC, BMW GROUP COMPANY,
and ROYAL MOTORS, INC.,

      Defendants-Respondents.

_____

Submitted November 6, 2024 – Decided December 30, 2024

Before Judges Bishop-Thompson and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0846-20.

Lento Law Group, PC, attorneys for appellant (Samuel D. Jackson, on the briefs).

Porzio, Bromberg & Newman, PC, attorneys for respondent BMW of North America, LLC (Roy Alan Cohen and Jennifer A. Kelliher, of counsel and on the brief).

PER CURIAM

In this products liability case, a dispute arose as to whether plaintiff authorized her attorneys to settle the case. Plaintiff Aliyah Harmon appeals from a July 18, 2023 order, following a plenary hearing, granting defendant BMW of North America, LLC's motion to enforce the settlement agreement entered as a result of arms' length negotiations between the parties' counsel. We affirm.

I.

We summarize the relevant facts from the motion and plenary hearing record. On March 16, 2020, plaintiff filed a complaint alleging product liability and breach of contract claims against defendant arising from a July 26, 2018 fire-related incident involving her 2008 BMW vehicle. At that time, she was represented by Russell S. Warren, Jr., Esq. (Warren).

The matter proceeded with discovery. On March 13, 2023, the parties attended mediation, which proved unsuccessful. Plaintiff testified she learned for the first time at mediation that if the matter proceeded to trial, she would be responsible for the trial costs upwards of $30,000.00. Plaintiff and Warren disagreed about the value of the case and how to proceed. Dissatisfied with her attorney's advice, plaintiff began exploring alternate counsel.

A-0006-23

Plaintiff was previously represented by Jeanine Warrington (Warrington) of the law firm D'Arcy Johnson Day (DJD) in a workers' compensation matter. Given their prior attorney-client relationship, plaintiff testified she had a trusting relationship with Warrington. Therefore, she contacted her about this case.

Warrington testified, in early 2023, when plaintiff contacted her about the case, plaintiff explained she was "in a bit of a bind" because she did not want to accept the settlement offer made at mediation, as she viewed it as "unfair," and so, she needed representation for trial. Plaintiff then asked Warrington if her firm would get involved with this case.

Warrington, who did not handle personal injury matters, contacted another attorney in her firm, Richard Albuquerque, Esq., (Albuquerque) to review the case. Albuquerque testified that before getting involved in the case, he requested plaintiff's permission to review the file and contact Warren and the mediator, a retired judge. Plaintiff authorized the firm to review the file and speak to those individuals.

Albuquerque testified he spoke with Warren about the case and relayed to plaintiff their discussions about working as "co-counsel" because, at this point, trial had been scheduled. Albuquerque testified he next spoke with the mediator and learned the offer at mediation had been $70,000.00. According to

Albuquerque, Warren was recommending the settlement offer to plaintiff. However, after reviewing the submissions, Albuquerque felt the case had more value, estimating between $100,000.00 and $150,000.00.

Albuquerque spoke again to Warrington, advising her: "if the client's expectations are changed or she's willing to consider a fair settlement value, something between a hundred and 150, which is where I thought the case should settle, [then] we would be happy to get involved with the case."

Warrington, who had been primarily communicating with plaintiff during this time via texts and emails, reported to Albuquerque that she spoke with plaintiff, who was willing to follow the firm's recommendations. Albuquerque relayed his preference to have the client's consent "in writing." Warrington then emailed plaintiff on March 27, 2023, at 2:16 p.m.:

> Dear Aliyah, prior to agreeing to handle your case against BMW, my firm is requesting your authority to settle this case for $125,000. Of course, we'll do our best to get more, but need your written consent to settle at $125,000 before proceeding. Thank you, Jeanine.

Plaintiff responded on the same date at 5:08 p.m.: "Yes, please proceed. Thank you, Aliyah." The next day, March 28, 2023 at 5:26 p.m., plaintiff responded to the email, reiterating:

> Dear Jeanine,

A-0006-23

Yes, I authorize you to move forward with my case per the terms set forth in your email below. Please reach out to me if you have any questions or concerns.

Kind regards,

Aliyah Harmon

Satisfied he had the client's authorization to proceed, on March 29, 2023, Albuquerque contacted defendant's counsel, Roy Alan Cohen, Esq., to advise that he was joining plaintiff's legal team. 5: The attorneys spoke on March 30, 2023, regarding the case, and engaged in settlement negotiations over several days. Albuquerque testified at one point he relayed to Warrington that "[w]e're stuck at a hundred" but requested that Warrington "please see" if plaintiff will accept $125,000.00. Ultimately, defendant agreed to settle the case for $125,000.00.

Defendant's counsel sent a confirming email with the Confidential Settlement Agreement on April 11, 2023. Although not anticipated by Albuquerque, it was decided that the settlement funds would be processed through the DJD firm. Albuquerque explained that he had not obtained a fee agreement from the client because he was not taking money from the client − either the settlement funds or payment for services − because Warren was plaintiff's attorney of record. Accordingly, when this changed and the

5

settlement funds were going to be processed through the DJD firm, Albuquerque sent plaintiff a retainer agreement on April 12, 2023, which plaintiff signed the same day.

After a period of days, the settlement agreement and release were not returned. At Albuquerque's request, Warrington followed up with plaintiff. Warrington stated that, in addition to the monetary settlement, plaintiff was now requesting a car. Albuquerque testified that he advised Warrington the case was settled, and the terms could not be changed. On April 17, 2023, Albuquerque contacted defendant's counsel to advise that plaintiff was not willing to sign the settlement agreement and release.

On April 21, 2023, defendant filed a motion to enforce the settlement, which plaintiff opposed. After reviewing the submissions, the motion judge determined there were disputed issues of material fact, and therefore, a plenary hearing was necessary.

A plenary hearing was conducted on June 27, 2023. In addition to plaintiff, Albuquerque, Warrington, and Warren testified. The parties stipulated, in lieu of testimony, that Terron Lewis, plaintiff's fiancé, would corroborate plaintiff's testimony regarding phone calls between plaintiff and Warrington in March 2023 discussing the case.

6

At the hearing, plaintiff confirmed contacting Warrington because of her dissatisfaction with her attorney and sending an email advising Warrington's firm to proceed with settlement. She explained why she sent the March 27, 2023 email to Warrington telling her to proceed with settlement if she, in fact, did not want to settle the case for $125,000.00:

> Because Jeanine [Warrington] told me that in order for them to even become my attorneys, that – and this was prior to, meaning that she basically told me that I would have the option later to be able to either go to trial or negotiate something different, that it wasn't set in stone, it was just them trying to see where my head was at with everything.

Plaintiff further claimed that DJD "never agreed to be [her] attorneys." Plaintiff testified, prior to signing the retainer agreement on April 12, 2023, she did not believe DJD was representing her in the present matter because "[w]henever an attorney [has] represent[ed] me, I speak to them often. They tell me what's going on. None of those things happened."

Warren testified that Albuquerque contacted him to review the case because "they were looking to come into the case and take it over." When Albuquerque first contacted Warren, but before providing him with the file, Warren spoke with and obtained plaintiff's consent. According to Warren, plaintiff confirmed she wanted to hire DJD as her attorneys in the matter.

7

Warren testified, "[t]he client told me to make sure that I gave them all of the information and that they were going to represent her." Based upon his conversations with the client, Warren believed DJD had "authority from the client" to engage in settlement discussions.

Warren testified that Albuquerque contacted him during the negotiations to advise him that a settlement offer of $100,000.00 was "on the table," but they were not going to take it. Albuquerque later notified Warren that a settlement had been reached.

On July 18, 2023, the judge issued an order with an accompanying seventeen-page decision granting defendant's motion to enforce the settlement. He found: (1) after arms' length negotiation between counsel, the lawsuit settled on April 11, 2023, for $125,000.00; (2) plaintiff's counsel received written authorization from plaintiff to accept the proposed settlement; and (3) the case was settled in its entirety.

The judge concluded that Warrington, Albuquerque and Warren were "much more credible" than plaintiff. The judge found these witnesses' testimony candid, forthright and reasonable. He further noted their testimony was consistent with each other and "was supported and corroborated based on the timeline and how each obtained knowledge of the facts."

A-0006-23

On the other hand, the judge found plaintiff less credible. He noted that plaintiff's testimony was unreasonable, particularly with respect to her "purported misunderstanding of authorizing the settlement." The judge found plaintiff's explanation of her email communications with Warrington "did not make any sense." Thus, the judge concluded plaintiff "clearly authoriz[ed] the monetary settlement."

This appeal followed.

## II.

Plaintiff argues the judge erred in five ways in enforcing the settlement agreement: (1) in finding that DJD were plaintiff's attorneys at the time the settlement was negotiated; (2) in finding that plaintiff's communication with DJD constituted actual authorization to settle; (3) in finding plaintiff's communications with DJD constituted apparent authority to settle; (4) in evaluating the credibility of the witnesses; and (5) in holding plaintiff was not fraudulently induced into providing authorization to settle the case. We have considered those arguments in light of the record and governing law. We discern no error in the motion judge's findings of fact and conclusions of law and affirm.

9

## A.

We defer to a court's factual findings in support of granting or denying the enforcement of a settlement agreement provided those findings are supported by sufficient credible evidence.  Balducci v. Cige, 240 N.J. 574, 595 (2020).  We defer to the trial court's credibility findings because the trial judge has a "better perspective than a reviewing court in evaluating the veracity of a witness."  C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

Deference is not due, however, to the court's legal conclusions. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We review the court's legal conclusions de novo.  See Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013).

## B.

Plaintiff contends the motion judge erred in finding an attorney-client relationship existed between plaintiff and DJD at the time of settlement negotiations.  Plaintiff argues the discussions with DJD never left the "preliminary, hypothetical stage," and DJD never "manifested . . . their consent" to enter into an attorney-client relationship.  We disagree.

An attorney-client relationship commences "[w]hen . . . the prospective client requests the lawyer to undertake the representation, the lawyer agrees to do so and preliminary conversations are held between the attorney and client regarding the case . . . . " Herbert v. Haytaian, 292 N.J. Super. 426, 436 (App. Div. 1996). "The creation of an attorney-client relationship does not rest on whether the client ultimately decides not to retain the lawyer or whether the lawyer submits a bill." Ibid.

No longer satisfied with her initial attorney's services, plaintiff reached out to Warrington, with whom she had a prior, trusting attorney-client relationship, and requested that Warrington's firm "get involved with the case." Plaintiff then consented to DJD receiving confidential case information from her present attorney to review "in hopes of" settling the case for a sum greater than $70,000.00. Plaintiff also granted permission for DJD to speak with attorney Warren and the mediator about the case.

We are satisfied that the judge correctly concluded that an attorney-client relationship was formed with DJD at that time. DJD was privy to confidential information regarding plaintiff's case, assessed the value of the case, and discussed the mediation with the mediator and plaintiff's initial attorney. As the

11

judge aptly noted, "[t]he fact that a retainer agreement was not executed until later does not alter that finding."

C.

Plaintiff next argues the judge erred in finding that there was both actual and implied authority to settle case. Specifically, plaintiff contends the March 27 and March 28, 2023 email exchanges between plaintiff and Warrington did not constitute actual authority to settle the case. Again, we disagree.

Plaintiff asserts that DJD was ethically obligated to bring any firm settlement offer to her before finalizing an agreement. In explaining why she sent an email on March 28, preceded by a similar text the day before, to Warrington telling her to "please proceed" with the case, plaintiff testified,

> Because Jeanine told me that in order for them to even become my attorneys, that -- and this was prior to, meaning that she basically told me that I would have the option later to be able to either go to trial or negotiate something different, that it wasn't set in stone, it was just them trying to see where my head was at with everything.

The judge, however, found that plaintiff's email "expressly authorized Mr. Albuquerque to settle the case for $125,000.00 . . . ."

"Stipulations . . . made by attorneys when acting within the scope of their authority are enforceable against their clients." Jennings v. Reed, 381 N.J.

A-0006-23

Super. 217, 230 (App. Div. 2005) (emphasis omitted) (alteration in original) (quoting Carlsen v. Carlsen, 49 N.J. Super. 130, 137 (App. Div. 1958)). This general principle has long been established in our jurisprudence:

> As early as 1888, in Phillips, . . . a defendant, who gave his lawyer general instructions to negotiate a settlement in a tort action, was bound by the agreement made by his attorney on his behalf where the defendant, after learning of the lowest sum plaintiff would accept, instructed the attorney to settle on the best terms he could obtain.
>
> [Id. at 230-231 (citing Phillips v. Pullen, 50 N.J.L. 439 (E. & A. 1888)).]

Thus, an attorney is presumed to be acting with authority on behalf of the client. Id. at 231. A "party asserting the lack of authority must sustain 'a heavy burden to establish that [her] attorney acted without any kind of authority in agreeing'" to enter a settlement. Ibid. (quoting Sur. Ins. Co. of Cal. v. Williams, 729 F.2d 581, 583 (8th Cir. 1984)).

"New Jersey law recognizes two types of authority to settle a lawsuit which would bind its client: actual, either express or implied, and apparent authority." Burnett v. Cnty. of Gloucester, 415 N.J. Super. 506, 513 (App. Div. 2010) (quoting Newark Branch, NAACP v. Twp. of West Orange, 786 F. Supp. 408, 423 (D.N.J. 1992)). Apparent authority exists when "the client's voluntary act has placed the attorney in a situation wherein a person of ordinary prudence

13                                                                    A-0006-23

would be justified in presuming that the attorney had authority to enter into a settlement, not just negotiations, on behalf of the client." Amatuzzo v. Kozmiuk, 305 N.J. Super. 469, 475 (App. Div. 1997) (citing U.S. Plywood Corp. v. Neidlinger, 41 N.J. 66, 74 (1963)). "Under implied authority, an agent is authorized to do what he may reasonably infer the principal desires him to do in light of the principal's manifestations and facts as he knows or should know them when he acts." Lampley v. Davis Mach. Corp., 219 N.J. Super. 540, 548-49 (App. Div. 1987) (citing Lewis v. Travelers Ins. Co., 51 N.J. 244, 251 (1968)).

Plaintiff asserts DJD had no apparent authority to act on her behalf because plaintiff never "manifested" to anyone, DJD or defendant, that she had given DJD such authority. This argument fails in light of the record. We note that plaintiff failed to raise the argument of apparent authority before the motion judge. Therefore, this issue is not properly before us. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available . . . .").

Nonetheless, we are satisfied that the record supports the motion judge's finding that actual authority existed for DJD to engage in settlement negotiations

14

on plaintiff's behalf. Because the judge correctly concluded DJD had actual authority from the client to settle the case, we need not reach the issue of whether DJD had apparent authority as well.

In crediting the testimony of Albuquerque, Warrington and Warren, the judge found plaintiff's actions, both express and implied − in contacting DJD for help with her case, authorizing the release of confidential information, sending text and email communications authorizing DJD to "please proceed" and "I authorize you to move forward with my case per the terms set forth in your email below" – demonstrate clearly plaintiff understood and expressly authorized Albuquerque to settle the case for $125,000.00 on her behalf.

Thus, we are satisfied the judge properly found that plaintiff had not met her "heavy burden to establish that [her] attorney acted without any kind of authority." Jennings, 381 N.J. Super. at 231. Accordingly, we discern no basis to reject the judge's determination that DJD acted with actual authority on plaintiff's behalf.

### D.

Plaintiff argues that the judge improperly assessed the credibility of the witnesses. Specifically, plaintiff asserts the judge failed "to properly apply the

factors used in assessing credibility, and instead relie[d] entirely on generic, conclusory language to justify its determination." This argument fails.

"Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999) (citing State v. Jamerson, 153 N.J. 318, 341 (1998)). The judge detailed his credibility findings, giving examples of his findings and ample reasons for his conclusions. We defer to those well-grounded findings.

E.

Lastly, plaintiff contends the judge erred in rejecting her argument that she was fraudulently induced into providing authorization to the DJD firm. Plaintiff claims DJD made false statements to her which induced her to sending the authorization email. We reject these claims as without merit.

Plaintiff alleges fraud as a basis to void the settlement agreement. Plaintiff alleges that Warrington made material misrepresentations to her during their phone conversations, inducing her to settle the case. During her testimony, Warrington did not recall any such conversations.

16

"In order to prove equitable fraud, a plaintiff must demonstrate a material misrepresentation made with intent that it be relied on, coupled with actual detrimental reliance." Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (citing Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 625 (1981)). Having heard the testimony of the witnesses and assessed their credibility, the judge did not find plaintiff's recollection of these communications with Warrington credible. Rather, he credited Warrington's testimony as "clear and concise" and found that she relayed "all information received from plaintiff to Albuquerque." We have no reason to reject the judge's findings. Thus, plaintiff has not established any material misrepresentation of fact, or that her agreement was induced by fraud or material representation. See Largoza v. FKM Real Estate Holdings, Inc., 474 N.J. Super. 61, 73 (App. Div. 2022). Without such, plaintiff's claims of fraudulent inducement fail.

### III.

In conclusion, the motion judge properly determined that a plenary hearing was necessary to resolve the genuine issues of material fact in dispute. Thereafter, he carefully considered and evaluated the evidence and credibility of the witnesses. The judge made detailed findings of fact and applied the relevant law to those facts, concluding that defendant met its burden to establish

17

a settlement agreement was voluntarily entered by the parties on April 11, 2023. The judge further found that an attorney-client relationship had been created between plaintiff and DJD, and DJD had express authority to negotiate and settle the case for $125,000.00. The judge correctly found that the case in its entirety was settled. Accordingly, we affirm the order granting defendant's motion to enforce the settlement agreement.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0006-23